KYSELKA *v.* NORTHERN ASSURANCE CO. OF MICHIGAN.

1. INSURANCE — CONTRACTS — CRITICISM BY AGENT — DISMISSAL — ESTOPPEL.

Criticism of the president of defendant insurance company by plaintiff, one of its agents, which was cordially received and the agent thanked for his frankness by the president, was not reasonable cause for plaintiff's dismissal three months later, where the effect would be to deprive him of his interest in renewal premiums guaranteed to him for a number of years by his written contract with defendant.

2. SAME—RESIGNATION—DISMISSAL.

Where plaintiff would have been entitled to such renewal premiums in case he resigned his agency, defendant could not, through a formal discharge for an insufficient reason, anticipate plaintiff's resignation and deprive him of the just fruits of his labors.

3. APPEAL AND ERROR—DIRECTED VERDICT—QUESTION OF FACT—ESTOPPEL.

Where appellant's counsel, in response to a question by the trial court, said he did not think there was any question for the jury; that it was a matter that must be entirely decided by the court, appellant cannot now complain even if in the determination by the court a question of fact was involved.

4. DAMAGES—INSURANCE CONTRACT.

In an action for renewal premiums under an insurance agency contract, plaintiff could recover only such payments as were due at the time he started his suit.

Error to Grand Traverse; Mayne, J. Submitted October 5, 1916. (Docket No. 36.) Decided December 22, 1916.

Assumpsit by Albert G. Kyselka against the Northern Assurance Company of Michigan for breach of an agency contract. Judgment for plaintiff on a di-

rected verdict. Defendant brings error. Reversed, with instructions to enter a verdict in accordance with opinion.

*Fred H. Aldrich* and *Parm C. Gilbert,* for appellant.
*Covell & Cross,* for appellee.

BROOKE, J. On the 6th day of April, 1910, plaintiff entered into a contract with the defendant company by the terms of which he became its general agent in the State of Michigan, without exclusive territory, with power to appoint agents to work for himself in behalf of said company and to procure applications for insurance in accordance with the rules of said company. Attached to said contract there was a schedule of commissions on first year premiums. It was also provided in said contract that said first party should receive 7½ per cent. upon all renewal premiums except business reinstated by company officers or home office employees. This contract further provided that after five consecutive years of service, in case said first party had written a certain amount of insurance and should resign, he should receive the specified renewals upon the business produced by his agency, and in case of the death of the first party after two years the renewal commissions were to be paid to his wife for the number of years which he had been in the employ of the company, provided paid-in insurance of at least $100,000 had been secured by plaintiff each year. Under this contract plaintiff went to work, and through his agency produced paid-in insurance as follows: 1910, $54,385; 1911, $72,000; 1912, $411,-308.45; 1913, $209,000—a total of $746,693.45. On February 3, 1914, the contract between plaintiff and defendant was modified in several important particulars. Plaintiff's territory was restricted to the three counties of Calhoun, Branch, and St. Joseph, and the company reserved the right to control, remove and

promote his agents. The most important modification was with reference to plaintiff's right to renewal premiums. It was provided:

"After three consecutive years' service in the employ of the company, under this contract, should the said second party resign his connection with the company, under this contract, he shall receive renewal commissions as above for as many years thereafter as he has been in the employ of the company hereunder, provided that paid for assurance of at least three hundred thousand dollars has been written by the agency during the first three years of this contract, beginning April 6, 1910.

"Should the party of the second part die after two consecutive years' service under this contract, his wife, if any, and, if not married, then his estate shall receive the renewal commissions herein provided for, continuous during the life of the policies theretofore written by said second party under the terms of this contract during the continuance of such policies by the payment of renewal premiums thereon each year, provided, paid for assurance of at least three hundred thousand dollars has been written by the agency during the first three years, beginning April 6, 1910."

At the time this modified contract was entered into, plaintiff had written the requisite amount of insurance, so that if he had resigned at once he would have been entitled to the renewals provided for, as a matter of right, for as many years as he had been in the service of the company. Prior to the making of the modified contract, and on December 2, 1913, the defendant company through its president and general manager, C. L. Ayers, had issued a letter of instructions to the plaintiff. Important parts of said letter were as follows:

"In accordance with the further spirit and purpose of the contract above referred to, you are directed in the future not to carry on correspondence with any part of the company's organization in a manner that will be calculated to cast reflections either upon the

integrity or good judgment of the management of the company, thereby making yourself a detriment instead of a help to the interests of the company, thus violating the spirit and very purpose for which your contract was made. * * * Any violation of these instructions, or any other part of the above referred to contract, at any time by you, will result in your summary dismissal from the company's service, and the termination of your contract and all of your interest therein."

Upon receipt of said letter plaintiff wrote as follows:

*"Dear Mr. Ayres:* In answer to yours of the 2d I admit the letter to McConnell was damned (or darned) foolishness. The instructions given are fair, and am willing to abide by them."

Between the date of the letter of instructions, December 2, 1913, and the date of the supplemental contract, February 3, 1914, the relations between the plaintiff and the defendant company appear to have been amicable. In April, 1914, an article was published in an insurance journal called Matson's Monthly, which very strongly reflected upon the business methods of the defendant company and its management. In the course of said article the following appeared:

"During the year 1913, $2,700,000 of insurance was written. The mortuary savings in business in force was $60,000. The interest earned, $13,000. Surplus $2,000 less than the previous year. So to write $2,-700,000 the company spent $75,000 over and above expense of loading on the new business."

This article seems to have found its way into the hands of many of the agents of the defendant company, and among them it reached the plaintiff. On September 1, 1914, plaintiff was discharged by the defendant company because of alleged disobedience of the letter of instructions above referred to. This disobedience consisted in alleged statements (denied by plaintiff)

made by plaintiff to one or more members of the agency force of the defendant company and in the writing of certain letters by plaintiff to various members of the board of directors of the defendant company and to the president and general manager of the company. It is strongly urged on behalf of the defendant that these letters show a spirit of insubordination on the part of the plaintiff, and that they were intended by him to cause distrust among members of the organization and bring about injury to the company. The letters are somewhat voluminous and will not be here set forth in full, but an effort will be made to indicate their general tenor. The first one is dated June 6, 1914, and is addressed by the plaintiff to C. L. Ayres, the president of the company. It is in answer to a letter written by the president to the plaintiff. Plaintiff replies to a criticism made by the president and Mr. Hull, the vice president, to the effect that plaintiff "knew it all." The letter is very frankly critical of the president and is somewhat patronizing in tone. It is not such a letter as should ordinarily be written by a subordinate to a superior officer and in our opinion might very properly have called for a rebuke from the president; but, so far from having offended the president, we find that on June 10, 1914, the president replied thereto, opening his letter as follows:

"*Dear Mr. Kyselka:* I have read with a great deal of interest and care your esteemed letter of the 6th inst., and I am truly glad to hear from you in this frank, open and confidential manner."

Then follows two or three pages of general comment upon the principles of business, and it ends as follows:

"Again thanking you for your letter, and with kind personal regards, I am,

"Very truly yours,

"C. L. AYRES, Pres. & Gen. Mgr."

In view of the very cordial manner in which the

responsible head of the defendant company received plaintiff's criticism, we are of opinion that the company cannot now say that the writing of this letter was reasonable cause for his dismissal three months later. On the 9th day of June, 1914, plaintiff wrote a letter to Mr. Joseph Seldon, one of the directors, in which he advises Mr. Seldon of the resignaticn of several of the agents. He further says:

"The article in Matson's Monthly for April makes for more discontent. Our showing for the past year is another factor. I have it on good authority that C. L. Ayers said we would not write over one and one-half millions of business this year. I would like to talk to you, and would thank you to hold this letter in strict confidence. If you have any stock my advice is to sell. Mr. Hull has been buying all he can get, and you may be able to dispose of it to him. A business built on a foundation of distrust cannot stand."

On the same day he wrote a letter to Mr. A. A. Anderson, another director, in reply to a letter from Mr. Anderson to him, dated on the 7th. He again recites the resignations that have occurred and closes the letter as follows:

"The article in Matson's Monthly for April has added fuel to the flame of discontent. Our showing this year is another factor. I would like to have a talk with you if you care to give me the time."

On June 26, 1914, plaintiff wrote a letter to Mr. Hull, a director and vice president of the defendant company, complaining of having overheard a remark made by Mr. Hull to the effect that he (plaintiff) "knew it all." In the course of it he said:

"What I have learned since I talked with you makes the Matson article appear mild."

In July, 1916, a second letter was written Mr. Hull. This is a long letter, in the course of which plaintiff says:

"The article in Matson's is not a joke when in the hands of competitors. I know the other side of part of the article, and I know that the entire article is not false in every particular, for I took the matter up with the insurance department at one time. If it is false, why don't you sue them? The Postal Life is now suing the Life Insurance Independent for false statements made. Why doesn't the Northern do the same with Matson's? * * * I hope I shall be able to talk with you within thirty days, possibly on the cruise to Mackinac."

On July 7, 1914, plaintiff wrote another letter to Mr. Seldon as follows:

"Can you give me any hope for the future success of the Northern? I may be duly (unduly) despondent as to the outlook. Do you travel by way of Chicago when going to Detroit? If you do, I would like to ride with you and talk over the situation when you come through Battle Creek."

And on the same day he wrote to Mr. Anderson as follows:

"I feel some anxiety in regard to the future of our company because of the feeling of discontent and distrust in our agency force, and Dr. Gallagher, with whom I have an office, told me that you would give me a fair opinion as to its outlook if I wrote you."

And on the same date plaintiff wrote another letter to Mr. Grawn, in which he stated that one King, a former employee of the defendant company, was in possession of facts "which may be of value to you." In another letter upon the same day to Mr. Grawn, in answer to a letter from Mr. Grawn, plaintiff goes over the late resignations, and then adds:

"Inasmuch as I am telling you this in confidence, I may as well tell you the spirit of distrust is strong on account of the way the president has treated several of the boys in the field. * * * Matson's Monthly published in Indianapolis came out in April scoring C. L. A. (Ayres) and the work of the so-called

Inner Circle of Directors. I presume you have read it. I would not call a meeting of directors until we get our facts together. If I do not see you I shall write you again within ten days."

It is the claim of plaintiff that these letters should be construed by the court, and that a fair construction of them will compel the court to the conclusion that they indicate on the part of the writer such a spirit of insubordination and such a desire to injure his employer, the defendant, as would and did warrant the defendant in canceling plaintiff's contract and discharging him from its employ.

Mr. Grawn, a witness on behalf of the defendant and one of its directors, referring to letters written by plaintiff to him, said:

"I turned them over to Mr. Ayres upon his request, and I did not see anything in the letters that were detrimental to the company. There was some statements as to agents leaving the company, but I did not consider that was detrimental to the company. That occurs right along. I have seen a few articles at Matson's, but I don't know whether I saw the one he referred to or not."

At the conclusion of all the testimony, the court asked counsel for both parties whether there was any question of fact to be submitted to the jury, or whether the matter should be disposed of by the court.

*"Mr. Cross* (counsel for plaintiff): That is for the court to interpret the written evidence.

*"The Court:* The question is: Do you want the court to instruct the jury and direct a verdict, or would it be safer to leave it to the jury upon legal propositions?

*"Mr. Covell* (counsel for plaintiff): We would be willing to leave it to the court.

*"Mr. Aldrich* (counsel for defendant): Yes, I think so. I do not think there is any question for the jury; it is a matter that must be entirely decided by the court.

"*The Court:* And do I understand the plaintiff the same way?

"*Mr. Cross:* Yes, sir; we are willing to leave it the same way."

Whereupon the court held that the letters written by plaintiff to the various members of the board of directors and the president of the defendant company were written by him in good faith, that the writing of said letters did not constitute just ground for dismissal, and directed a verdict in the sum of $907.94, that being the conceded amount of the plaintiff's renewals from September 1, 1914, to September 1, 1915. This action of the court occurred on October 27, 1915. We note that the declaration in the case was filed on August 3, 1915, nearly 30 days before the last quarter's premiums were due. Having instructed the jury to render a verdict in the sum mentioned, one of the attorneys for the defendant said to the court:

"I wish to suggest that that amount could not be recovered under the holding of your Honor; even under this declaration it could only be for such amount as was due prior to the commencement of suit, two quarters, if the holding of the Court was correct.

"*The Court:* The court holds that it shall be for the amount up to the full year, the time being past."

Many authorities are cited by defendant to the effect that it is the duty of a servant and agent to be loyal and obedient to his master or principal, and there is no doubt that such is the law. The difficulty in the case at bar comes when an attempt is made to apply the conceded principle to the facts. In examining and weighing the plaintiff's conduct we must consider his situation and surroundings. At the time the letters were written he had been in the employ of the defendant company for upwards of four years. He seems to have been unusually successful, and certainly wrote insurance far in excess of the minimum stated in his contract, which minimum entitled him to receive the

renewal commissions.  He had acquired a very sub-
stantial interest in the business of the company, and
it is very plain that anything which tended to imperil
that interest was a matter of deep import to him.
The publication of the article in Matson's magazine
in April was such an incident.  An examination of the
plaintiff's letters shows that he is somewhat immature
in a business way and inclined to talk or write more
than is necessary or perhaps wise; but, upon a review
of the entire case, we have no hesitation in agreeing
with the conclusion of the learned trial judge that the
letters were written, not in a spirit of insubordination,
but rather with a sincere desire to ascertain the truth
as to conditions and to protect, if possible, the plain-
tiff's legitimate interests.  From other correspondence
which we have not quoted it is apparent that plaintiff
was about to resign, in which event, according to the
terms of his contract, he would have been entitled to
the benefit of the renewals for a period equal to the
length of his service with the company, and the corre-
spondence indicates that defendant knew or had good
reason to believe that plaintiff contemplated this
course.  Defendant cannot through a formal discharge
for an insufficient reason deprive plaintiff of the just
fruits of his labors for upwards of four years.

Error is assigned upon the action of the court in
directing verdict for plaintiff.  Counsel for appellant
says:

"Counsel did not consent at that time to the judge
deciding upon any question of fact, and at this time it
seems to them preposterous for the court to undertake
under all of the circumstances in this case to say as
a matter of fact that the plaintiff was excusable for
his conduct in disobedience to the orders of his supe-
riors in the company for which he was working, or
for the violation of his duty in any way towards the
said company."

In the light of the dialogue which occurred between

the court and counsel for both parties at the conclusion of the case, we are of opinion that counsel cannot now complain even if in the determination by the court a question of fact was involved. *Culligan* v. *Alpern,* 160 Mich. 241 (125 N. W. 20) ; *Germain* v. *Loud,* 189 Mich. 38 (155 N. W. 373).

We think the court was in error in entering a judgment in favor of the plaintiff for a full year's renewals. As before pointed out, the declaration was filed on August 3, 1915, and the last quarter was not payable under the terms of the contract until September 1, 1915. Under the declaration plaintiff could recover only such payments on account of renewals as were due at the time he started his suit. *Conrad Seipp Brewing Co.* v. *McKittrick,* 86 Mich. 191 (48 N. W. 1086), relied upon by plaintiff, is not controlling. We are unable to gather from the record the exact amount for which judgment should have been entered.

The case is therefore reversed and remanded, with instructions to enter a verdict in favor of the plaintiff for the amount of his renewal premiums due under the terms of the contract at the time he filed his declaration. No costs of this appeal will be allowed to either party.

STONE, C. J., and KUHN, OSTRANDER, BIRD, MOORE, and STEERE, JJ., concurred. PERSON, J., did not sit.