CITY NATIONAL BANK v. PRICE'S ESTATE.

1. TRIAL—DIRECTED VERDICT PROPER WHERE REQUESTED BY BOTH PARTIES ALTHOUGH TESTIMONY CONFLICTING.

Where both parties without reservation requested a directed verdict and put it up to the court to pass upon whatever the record presented, there was no error in the court's assuming to do so, although there was room for conflicting inferences from the testimony.

2. Bills and Notes—Banks and Banking—Payment on Release of Collateral.

> In an action by a bank against the estate of an indorser on a promissory note, defendant's claim that sufficient collateral had been placed with the president of the bank to cover all of the maker's indebtedness, including said note, and that when the collateral was released the note should have been retired, *held*, not established, in view of the indorser's relation to the bank as a director therein, and the fact that the collateral had been released over three years before the renewal note in question was given.

Error to Ingham; Carr (Leland W.), J. Submitted June 6, 1923. (Docket No. 30.) Decided December 19, 1923.

The City National Bank presented a claim against the estate of Lawrence Price, deceased, for the amount of a promissory note. The claim was disallowed by the commissioners, and plaintiff appealed to the circuit court. Judgment for plaintiff on a directed verdict. Defendant brings error. Affirmed.

*Richard Price* and *Joseph H. Dunnebacke*, for appellant.

*Charles W. Nichols*, for appellee.

Steere, J. Lawrence Price died in Lansing on February 12, 1917. He was at that time and had been since January 12, 1909, a director of plaintiff's bank, twice a member of its examining committee and for a year a member of its discount committee. At the time of his death the bank owned and held as unpaid a promissory note for $500 dated October 13, 1916, due 90 days thereafter, signed by C. E. Chamberlain and Carrie Chamberlain, and indorsed by said Lawrence Price. It ran in usual form, "For value received, with 6 per cent. interest," with the added

provision that "All parties to this instrument do hereby expressly waive presentation, demand, protest and notice of protest."

Plaintiff filed a claim, based on this note, for $500 with accrued interest, against the estate of said deceased in the probate court of Ingham county. It was disallowed by the commissioners on claims and appeal was taken to the circuit court of Ingham county, where a verdict was directed for plaintiff and judgment entered thereon against said estate. Upon the trial plaintiff made proof of the note, its ownership, and that the same had not been paid, making out by these facts a *prima facie* case. No claim was made that the makers of the note or Mr. Price had ever gone to the bank and directly paid the amount of the note, but it was contended, and testimony introduced against objection to sustain the claim, that Mr. Price was released from his indorsement by reason of claimed misapplication of certain collateral. A motion by the defense for a directed verdict was denied. Defendant's assignments of error are based on the proposition "that the note has been paid or ought to have been paid and would have been paid if certain collateral up in the hands of the bank was properly accounted for," and cover refusal of the court to direct a verdict for the defense, granting plaintiff's motion for a directed verdict, and charging the jury as follows:

"On the showing made here I do not think it can be said that if there was an improper disposal of the stock of the Perry-Barker Company, the City National Bank can be charged with such action. In other words, Mr. Davis, as trustee, handled the stock. He did not handle it as president of the City National Bank and on the showing made here I don't find that the City National Bank was bound by what he did in that regard. It is certain that the bank did not receive payment of the amount due on the note. I charge you, therefore, ladies and gentlemen of the

jury, that the special or affirmative defense raised here has not been made out by the proofs and that on the record as it stands before you the plaintiff is entitled to recover the amount of the note with the interest thereon, viz.: $622.25.   Your verdict will accordingly be for the plaintiff in that amount."

The testimony relating to this defense ranges over a period of some 10 years, starting prior to March 15, 1907, at which time the Perry-Barker Candy Company was inaugurated.   It was incorporated with a capitalization of $25,000 divided into 2,500 shares with a par value of $10 each.   The amount actually paid in as stated in its articles of association was $4,000 in cash and $7,000 in other property consisting of the merchandize, tools and machinery of the Lansing Confectionery Company.   Claude (C. E.) Chamberlain, one of the makers of the note in issue here, was one of the incorporators, subscribed its articles of association for 700 shares, was a director and the first president of the corporation.   Lawrence Price and Harris E. Thomas were also directors. Price was its second president and Thomas succeeded him in 1910.

The corporation took over the business and property of the Lansing Confectionery Company, a copartnership composed of Claude E. Chamberlain and his mother, Carrie Chamberlain, who transferred all its assets to the Perry-Barker Candy Company and dissolved their partnership on that date.   Previous to their partnership, the business belonged to and was carried on by Claude and his father, as copartners, and on the latter's death Mrs. Carrie Chamberlain took the place of her husband as a partner in the firm. At the time the firm was dissolved and the Perry-Barker Candy Company took over its assets and business at a valuation of $7,000, the Lansing Confectionery Company was indebted to the City National Bank

in the principal sum of $8,450 which with accrued interest then amounted to $8,537.25.

Of the 700 shares of stock in the Perry-Barker Candy Company subscribed for by Claude Chamberlain on March 18, 1907, to be issued in payment for the assets of the confectionery company then turned over, one share was issued to Claude and 699 shares were issued on May 25, 1907, certificate No. 7, to "B. F. Davis, trustee for the John Chamberlain estate." Claude Chamberlain testified that the agreement between him and Davis as to this being done "was all verbal" and explained that, "inasmuch as we were owing the bank considerable money from the Lansing Confectionery Company that stock was turned over to Mr. Davis as trustee to take care of the indebtedness for the bank."

It appears that $4,000 of the indebtedness of the confectionery company to the bank, on March 15, 1907, was represented by a note dated October 13, 1906, due January 11, 1907, signed by the Lansing Confectionery Company, indorsed by H. E. Thomas, Claude and Carrie Chamberlain. This note, according to the records of the bank, appears to have been renewed with the same maker and indorsers on December 4, 1907, and carried until February 12, 1909, when it was "cleared" on the records on receipt of a personal note given by Thomas with some Auto Body and New-Way motor stock as collateral. This personal note was renewed by Mr. Thomas from time to time down to at least August, 1913, in which month Mr. Davis assigned the 699 shares of Perry-Barker stock to Thomas, to whom new certificates were issued by the corporation for the number of shares of stock covered by the old certificate so assigned to him by Davis. It is claimed for the defense that in this transaction a former $500-note of which the one in issue here is the last in a series of renewals was

either paid in fact, or in effect, by releasing stock held with it as collateral.

Just when, or what for, the original indebtedness of the confectionery company represented by the note in question arose is in some particulars left to conjecture, or inference. Price had been an indorser for the confectionery company before the Perry-Barker Candy Company was incorporated. The bank records show it handled a 30-day note of the confectionery company for $3,450, dated September 7, 1906, indorsed by Price and the two Chamberlains, which was taken up, or renewed, on October 11, 1906, by two 30-day notes dated October 8, 1906, given by the confectionery company and indorsed by the Chamberlains, one for $2,950 and the other for $500. The latter remained in the bank past due and unpaid when the Perry-Barker Candy Company was incorporated in March, 1907, and was then "cleared," as the assistant cashier testified—

"by giving a demand note which passed through the bank's hands on December 4, 1907, said note being signed by the Lansing Confectionery Company and indorsed by Carrie and C. E. Chamberlain and Lawrence Price for $500, said note being dated November 23, 1907."

This note was cleared on May 25, 1908, by a 90-day note for $500 given by C. E. and Carrie Chamberlain and indorsed by Lawrence Price. Commencing with August, 1908, and down to October 13, 1916, when the note in issue here was given, there were as the witness testified, a succession of "approximately 34 renewals," some eight or ten of which were subsequent to the time when the records of the Perry-Barker Candy Company show Thomas had acquired the 699 shares of its stock now claimed to have been held by Davis as trustee to protect this note. Davis testified that the stock was turned over to him as trustee for the indebtedness of the confectionery com-

pany "exclusive of this $500 note which Mr. Price indorsed. * * * That was the understanding of Mr. Chamberlain and Mr. Price." With this Claude Chamberlain's testimony was decidedly at variance. His claim and testimony are in substance that Davis' "verbal" trusteeship of the 699 shares of stock was "to take care of the indebtedness for the bank," owed by the confectionery company, including this note, and Davis was only authorized to sell the stock at par. He admitted that he heard "a good many years ago" that Thomas had taken up the $4,000 note of the confectionery company which he had been indorsing for them, and heard "quite a number of years ago" that the stock was transferred to Thomas, but "every time I asked Davis with regard to it he told me to sell out the stock." He also testified that "within the last two or three or four years" he asked Davis for an accounting and "he told me there was not any accounting, as near as I can remember, that it was closed; that he was not in a position to give me one." He did not claim that he "or Mr. Price have ever gone into the bank and actually paid the note," but that the bank had "ample security" for it. Davis testified that since Price's death Claude had claimed there was a deposit of $1,200 due the confectionery company out of which the note "was to have been paid," that there was in fact no such deposit, and he had never made any such claim until after Mr. Price's death "but notwithstanding the fact that the note had been so long in existence he still continued to renew it and paid nothing on it."

This originally simple matter of a straightforward indebtedness of a business firm to a bank, evidenced by indorsed paper, is more or less confused by claimed trusteeships with which those handling the business seem to have been obsessed. The 699 shares of stock in the Perry-Barker Candy Company subscribed for by Claude Chamberlain, its first president, were issued

to Davis as "trustee for the John Chamberlain estate," just what the duties of. that trusteeship were rests in parol and is in dispute.   Davis is said to have held some kind of a trusteeship for the bank.   He does not seem to be very clear as to his position in that dual capacity.   Referring to the stock which he held as trustee for the John Chamberlain estate, he was asked and  answered:

"*Q*. You took this over as trustee for the indebtedness of the candy company at the time you took it?

"*The Court:* Trustee for whom?

"*A.* For the bank, yes.

"*The Court:* Were you acting as trustee for the bank?

"*A.* Well, in a sense; it was turned over to me as trustee for the indebtedness of the candy company.

"*Q*. The candy company?

"*A.* Yes, sir.

"*Q*. Now, there was no paper drawn up at that time between you and Chamberlain; it was just a verbal understanding?

"*A.* As to the collateral?

"*Q*. As to what the trust you were undertaking to perform was?

"*A.* I do not recall as to that."

Mr. Harry A. Silsbee, attorney, testified that in 1907 or prior thereto he was appointed by the Chamberlain family trustee for the benefit of unsecured creditors of the confectionery company other than the City National Bank which held certain secured indebtedness.   For that purpose the family deeded to him certain real estate, including a piece of property described as lot 3, block 15, city of Lansing, Michigan, upon which Davis as trustee also held a second mortgage prior to Silsbee's trust title, as well as security on the north half of a lot in East Jordan, Michigan, and to facilitate sale of the equities which he held in this property and turn them into money he said:   "I had an agreement with Mr. Davis, the

president of the bank and the trustee acting for the bank."

This document, dated September 16, 1908, signed by B. F. Davis, trustee, and Harry A. Silsbee, trustee, and a supplemental one of June 17, 1909, signed by the same parties in the same capacity, disclose that Silsbee with the consent of Davis had sold the equity held by him in the East Jordan property for $919.25, which was to be deposited in the City National Bank as a special fund awaiting the annual meeting of the Perry-Barker Candy Company for a determination of whether the stock issued to Davis would sell for sufficient to pay the obligations of the confectionery company held by the bank, in which event the $919.25 was to be turned back to Silsbee.   It was also provided, in the first agreement, that Silsbee as trustee should pay the instalments as they became due on the building and loan mortgage and so protect Davis' second mortgage, Davis agreeing that if it became necessary to foreclose that mortgage he would repay the sums which Silsbee might have paid on the building and loan mortgage after February, 1908.   This amount was deposited by Silsbee as agreed.   By the supplemental agreement of June 17, 1909, it appears that like arrangement was made as to $568 realized from equities by Silsbee and deposited in that account, making the amount so turned in by him $1,487.25. The records of the bank also show that two other cash items were received by Davis as trustee amounting to $1,048.50, apparently received as dividends on the Perry-Barker Candy Company stock before it was transferred to Thomas in 1913, making a total received by him in the trustee account $2,535.75.   The records further show that on May 31, 1913, there was a charge against this account of $2,535.75, which the deputy cashier of the bank testified was to take up a demand note of the Chamberlains of $2,123.55 and

its accumulated interest, being for a portion of the original indebtedness owed the bank by the confectionery company at the time it was dissolved.

Much testimony was taken and time spent in going over the records of the bank to trace the history of various notes it held against the confectionery company from the time it was dissolved until the time of Mr. Price's death.    From these in connection with the testimony of Thomas and Davis it was contended by the defense that the $500 note in question either was or ought to have been paid out of the proceeds of the securities held; while it was contended by plaintiff this was not affirmatively shown and the inference was to the contrary.

Of $8,537.25 indebtedness of the Chamberlains to the bank when their partnership was dissolved in 1907, Thomas was liable as an indorser at the bank for $4,000 of it.    The moneys received from time to time from Silsbee on mortgage securities, dividends on the stock held by Davis as trustee until 1913, or whatever was paid by the Chamberlains was applied on other of their indebtedness than the note indorsed by Thomas.    He testified that he had been indorsing renewals and paying interest on  that note and expecting he would have to pay it anyway, until February, 1909, when he concluded to assume it in his own name which he did, securing it with Auto Body and motor stock as collateral, and continued to carry it, that there was no market for the Perry-Barker stock Davis held and made every effort to sell, that he himself tried to get some of the other creditors to take it and pay what there was  against it but they refused, and finally he took it himself, paying for it some less than the par value but more than it was worth.

Both Davis and Thomas ventured the recollection that the latter paid between $6,000 and $7,000 for this stock.    For the defense it is contended that there-

fore the full indebtedness of the confectionery company, including this $500, was or should have been paid.    Apparently neither of those witnesses had refreshed his memory in any way and both manifested but a dim recollection as to the details of that transaction.    Davis said the stock "was turned over to Mr. Thomas, who was indorser on a note, after he had retired the note;" but until shown to the contrary, thought the stock had never been transferred to Thomas.    His examination ends as follows:

"*Q.* Did Mr. Thomas pay you any money at the time that he took that stock in 1913?

"*A.* He gave us his paper but whether there was anything beyond that or not I cannot tell you from memory.

"*Q.* Well, would the records of your bank show you what paper he gave you?

"*A.* Yes, sir.

"*Q.* Well, have you looked it up to see what paper he gave you?

"*A.* I have not.

"*Q.* Then you could if you saw fit, tell exactly what paper he gave you and how much cash he gave you?

"*A.* Why, certainly; that has been shown here, has it not?

"*Q.* No.

"*A.* You spoke of a note of $4,000?

"*Q.* Yes, sir, that has been stated and that is the only thing that has been shown.    Beyond that it is all surmise and you can't give us anything about it?

"*A.* No, sir.    Not from memory, no, sir."

Thomas' testimony was also beset with uncertainties.    He stated the amount he paid for the stock as between $6,000 and $7,000, but beyond the $4,000 note his memory failed him as to items.    Asked how he arrived at the approximate sum he gave, he replied:

"*A.* Well, it included the $4,000 note and what I have paid on it and what interest I had paid on it and also some balance due on some account, the note of the

Lansing Confectionery Co. over at the bank.  What notes they were I don't know.

"*Q.* Well, what notes were there of the Lansing Confectionery Co. owing to that bank that hasn't been put in evidence here; do you know of any?

"*A.* I don't know anything about it, no.

"*Q.* You don't know anything about it?

"*A.* No.

"*Q.* You cannot specify any note?

"*A.* No, sir.  I cannot tell any specific note, but it was some indebtedness owing some company that was secured ahead of mine.  *  *  *  Well, it was an indebtedness to the City National Bank that I took up; it was not any outside.

"*Mr.* ————— Indebtedness other than for the $4,000 note?

"*A.* Yes, sir.

"*Q.* What was it?

"*A.* I don't know.

"*Q.* You cannot remember the amount of it?

"*A.* No.

"*Q.* Who had given the note?

"*A.* I don't know; I cannot remember now.

"*Q.* Who had indorsed it?

"*A.* I don't know that even.   That was a long while ago.

"*Q.* Then you don't know that it was the Lansing Confectionery Co.?

"*A.* Well, I know it was the Lansing Confectionery Company but what note it was—

"*Q.* You have no recollection who signed it or who indorsed it?

"*A.* No, sir.

"*Q.* Or any note that you were on?

"*A.* No.   I was only on the $4,000 note.

"*Q.* Well, how about this note then that you speak of, that you can not identify?   How did it come to enter into it so that you were paying it?

"*A.* I paid it so as to get the stock, or the stock security for other indebtedness before mine.  *  *  * Well, they were entitled to it before I was and that is why I had to pay it.

"*Q.* They were entitled to it before you were?

"*A.* Yes, sir.

"*Q.* Do you know how they became entitled to it before you were?

"*A.* No, sir. I have no recollection about it at all.

"*Q.* Can you recall any conversation with the trustee himself, Mr. Davis?

"*A.* I do not recall any now. I do remember of figuring it up with some one in the bank and we had quite a little time figuring up just how much I would have to pay the bank in order to get the stock. I am not certain who it was; it may have been it was Mr. Davis, but my recollection is that it was with Mr. Hopkins.

"*Q.* It may have been this $500-note here?

"*A.* It may have been; I don't know anything about it."

While there may be room for conflicting inferences from this testimony, both parties without reservation requested a directed verdict and put it up to the court to pass upon whatever the record presented. There was, therefore, no error in the court's assuming to do so. *Culligan* v. *Alpern*, 160 Mich. 242; *Germain* v. *Loud*, 189 Mich. 38; *Kyselka* v. *Assurance Co.*, 194 Mich. 430. The only allegation of error for consideration is refusal of the court to direct a verdict for the defense where rested the burden of proof as to payment or release.

While not prepared to adopt in full the reasons given by the trial court, as applied to Davis' dual trusteeship, we find no occasion to disturb the result reached.

Under the law as it now stands Price was a joint maker of this plain piece of short time commercial paper taken and held as a live asset by the bank, of which he was a director and member of its discount committee when it and its predecessors were given. He was also a director of the Perry-Barker Candy Company when it issued this stock to Davis as trustee, and when it issued new stock to Thomas as assignee of Davis. The records of the bank show that as a member of its examining and discount com-

mittees he participated in their meetings and was attentive to duties.   On December 27, 1916, he was appointed with Mr. Cooley as a special committee to examine the condition of the bank and report to the directors.   He joined in a report stating that they had checked up the bonds, papers, etc., of the bank, which were found correct, and also "verified the collateral held as security for loans."   If the stock ever was collateral to this $500 indebtedness, which is denied by plaintiff, it had been released over three years before the note in question was given.   Aside from the positive testimony to meet defendant's claim, the presumptions arising from the undisputed facts shown here are not overcome by the indirect evidence and inferences urged against them.

The judgment is affirmed, with costs to plaintiff.

WIEST, C. J., and FELLOWS, MCDONALD, CLARK, BIRD, SHARPE, and MOORE, JJ., concurred.