## MILLS v. ANDERSON.

1. EVIDENCE — ORAL CONDITION NOT ADMISSIBLE IN ACTION ON WRITTEN CONTRACT—CORPORATIONS—SUBSCRIPTION FOR STOCK.

   In an action by the receiver of a bankrupt corporation to recover the amount of an unpaid subscription for stock, a letter written by the president of the corporation requesting the release of the subscriber from his obligation on the ground that the corporation did not comply with an oral condition under which the subscription became binding was properly rejected, in view of a provision in the contract that neither party should be bound by any condition not contained therein.

2. CORPORATIONS — ADMISSIONS — PRESIDENT MAY NOT RELEASE STOCK SUBSCRIBER FROM OBLIGATION.

   The obligation of a subscriber to pay his subscription for stock in a corporation may not be released by the president of the corporation.

[1]Evidence, 22 C. J. §§ 1486, 1664; [2]Corporations, 14 C. J. § 895.

3. SAME — COURTS MAY APPOINT RECEIVERS BUT MAY NOT DISSOLVE FOREIGN CORPORATION.

Courts· of chancery have inherent power to appoint receivers for domestic corporations, including dissolution, but have no power to dissolve a foreign corporation.

4. SAME—ATTEMPT TO DISSOLVE FOREIGN CORPORATION OPEN TO COLLATERAL ATTACK.

Any attempt of a court of this State to dissolve a foreign corporation would be a nullity and open to attack in a collateral proceeding.

5. SAME—COURT MAY APPOINT RECEIVER OF ASSETS' OF FOREIGN CORPORATION.

A State court may appoint a resident receiver of the corporate assets of an insolvent or dormant foreign corporation which are within its jurisdiction.

6. SAME—COURTS—JURISDICTION TO APPOINT RECEIVER.

That a petition prayed the court for dissolution of a foreign corporation, which was beyond its jurisdiction, did not deprive it of jurisdiction to appoint a receiver, for which prayer was also made.

7. SAME—SALE OF STOCK OF FOREIGN CORPORATION AUTHORIZED BY COMMISSION VALID, ALTHOUGH NOT LICENSED TO DO BUSINESS IN MICHIGAN.

Contracts by a foreign corporation for the sale of its stock, authorized by the securities commission under the blue sky law (3 Comp. Laws 1915, § 11945 et seq.), are legal, notwithstanding it otherwise carried on business in this State ·without complying with the domestication law (2 Comp. Laws 1915, § 9063 et seq.), relative to which its contracts are void and· unenforceable, since one is in no way dependent upon the other.

8. CONFLICT OF LAWS—SITUS OF DEBTS OR CHOSES IN ACTION.

Debts or choses in action, whether evidenced in the form of notes, bonds, drafts, certificates of stock, subscriptions for stock, etc., or not, are intangible property or property rights, which, in the strict sense of physical location, can have no real domicile or situs, but for the practical purposes of business, in dealing with, measuring and en-

---

³Corporations, 14a C. J. §§ 3158 (Anno), 3679, 4056; ⁴Id., 14a C. J. § 4056; ⁶Id., 14a C. J. § 4046; ⁸Id., 14a C. J. § 4046 (Anno); ⁷Id., 14a C. J. § 3988; Licenses, 37 C. J. § 166; 15 A. L. R. 262; 24 A. L. R. 523; 27 A. L. R. 1169; 30 A. L. R. 1331; 40 A. L. R. 1014; ⁸Conflict of Laws. 12 C. J. § 65.

forcing them, it is essential to impute to them a legal location, by the laws of which they may be treated and enforced.

9. DEBT—DEFINITION.

Although correlative, the term "debt" varies in meaning according to whether applied to debtor or creditor; as to the latter it is an asset, a chose in action, or personal right to be paid, which belongs and adheres to him wherever he may be, while as to the former it is a liability, obligation to pay, or indebtedness against, upon or following him, wherever he may go.

10. CONFLICT OF LAWS—SITUS OF DEBT WITH CREDITOR—EXCEPTIONS.

Although the weight of modern authority tends to the general proposition that the legal *situs* of a debt is with the creditor, various exceptional cases are recognized where that abstract proposition is inapplicable.

11. SAME—SITUS OF DEBT OWED TO FOREIGN CORPORATION.

Where a corporation, although incorporated in a foreign State, was organized for the purpose of engaging in business in this State, where its office, officers, and all of its property were located, and all of its business activities were carried on, the *situs* of a debt owing to it by a resident of this State on a subscription for stock is in this jurisdiction, where the debtor resides; the case coming within the recognized exceptions to the rule that the *situs* of a debt is that of the creditor.

12. APPEAL AND ERROR—WHERE BOTH PARTIES ASK FOR DIRECTED VERDICT NEITHER MAY COMPLAIN THAT CASE WAS NOT SUBMITTED TO JURY.

Where both parties ask for a directed verdict, the loser may not complain because the case was not submitted to the jury.

Error to Ingham; Carr (Leland W.), J. Submitted February 2, 1927. (Docket No. 60.) Decided June 6, 1927.

Assumpsit by D. H. Mills, receiver of the Lansing Theatre Company, against George P. Anderson for an unpaid stock subscription. Judgment for plaintiff on

[9]Debt, 17 C. J. § 1 (Anno); [10]Conflict of Laws, 12 C. J. § 65; [11]Id., 12 C. J. § 65; [12]Appeal and Error, 3 C. J. § 760; 4 C. J. § 2625.

a directed verdict.     Defendant brings error.     Affirmed.

*Thomas, Shields & Silsbee* (*Clayton F. Jennings,* of counsel), for appellant.

*T. Rogers Lyons* and *Ernest C. Smith,* for appellee.

STEERE, J.    Plaintiff recovered in the circuit court of Ingham county a judgment on directed verdict against defendant for $500 and costs, being the amount of the latter's claimed stock subscription in the Lansing Theatre Company.    Plaintiff's declaration, filed May 23, 1925, names him as "Receiver of the Lansing Theatre Company," without further description.    He declared upon the common counts in assumpsit, with notice that under the money counts he would give in evidence a written contract by defendant for 40 shares of preferred and 20 shares of common stock in the Lansing Theatre Company, setting the same out at length in the notice.    Defendant pleaded the general issue with a lengthy notice of special defense, the substance of which is that the alleged contract of subscription is invalid for various reasons, amongst which are that it was obtained by the theatre company's agent conditionally and by false representations.    At conclusion of plaintiff's testimony, defendant asked for a directed verdict, which was denied, and after both parties rested each asked for a directed verdict.    Defendant's request was denied and plaintiff's granted, the court directing a verdict in his favor for the amount of defendant's subscription.    All questions raised during trial by defendant were properly saved for review.

Upon the trial it was shown that the Lansing Theatre Company was a Delaware corporation organized on January 27, 1920, ostensibly for the purpose of constructing and controlling a theatre building in the city of Lansing, Michigan.    Its capital was fixed

at 20,000 shares of preferred stock of the par value of $10 and 15,000 shares of common stock of no par value, which it proposed to sell to the public in units of two shares of preferred and one of common for $25 per unit. It never domesticated as a foreign corporation authorized to do business in this State, but shortly after its organization it claims to have complied with our statute relative to listing and selling corporate stock, and in compliance with that law to have made required reports to the State securities commission of its operations in that particular.

Plaintiff was appointed receiver of the Lansing Theatre Company on a petition signed and sworn to by its manager and vice-president, A. L. Brown, as a creditor and at the request of a committee consisting of 25 of its stockholders and its two remaining directors, the rest of its directors having resigned, while its nominal president had left the project and State for other fields of endeavor. The company was then in financial straits and apparently insolvent, several suits had been started against it by creditors, while more were threatened, and it concededly could no longer continue the business for which it was organized. The petition prayed for a decree that it be dissolved, for an injunction, appointment of a receiver to collect and conserve its assets, liquidate its indebtedness so far as possible, etc. Various other matters are detailed in the sworn petition enlarging the subject and alleging grounds for exercise of equitable jurisdiction. On the trial all files and records relating to the appointment of the receiver were offered and admitted in evidence without objection.

Defendant's contract of subscription upon which this action is planted, and of which special notice was given, is dated January 16, 1923. It is signed by him, and by Brown as agent of the theatre company. In material parts it is as follows:

"I hereby subscribe for 40 shares of the preferred stock and 20 shares of the common stock of the Lansing Theatre Company to be sold in ratios, two shares of preferred and one share of common, twenty-five dollars, and agree to pay therefor the sum of $500, payable as follows: 10 per cent. of above amount when called by the company, 10 per cent. monthly thereafter until paid.

"It is understood and agreed:

"That this subscription shall not be binding until construction work is started on the company's site on Capitol avenue and Allegan street.

"When said construction work has started I agree to pay the above amount as specified.

"Upon acceptance this subscription becomes an asset of the Lansing Theatre Company and is not subject to cancellation.

"No statement or condition, not contained herein, nor alteration hereof, shall be binding or obligatory upon either party."

Upon the trial, plaintiff, Mills, testified that he was first appointed temporary receiver on February 4, 1925, and permanent receiver on March 14, 1925. He had taken possession of all assets, records, and files of the theatre company, which were turned over to him by its attorney. Among them were a number of unpaid subscription contracts, including the one involved here, which defendant refused to pay, and in performance of his official duty the receiver brought this action to recover amount defendant had subscribed.

Defendant's counsel argue his assignments of error under the following heads:

"1. Defendant's exhibit 1 should have been admitted in evidence.

"2. A verdict of no cause of action should have been directed for the defendant.

"3. It was error to direct a verdict for the plaintiff."

At the time this case was tried neither Butterworth, president of the theatre company, nor Brown, its vice-

president and manager, who swore to the petition for a receiver, were called as witnesses, and so far as shown were not available. Butterworth was in Florida. Brown's whereabouts is not disclosed. It appears that defendant knew Butterworth's location, and after this suit was begun obtained from him a letter directed to plaintiff as temporary receiver, dated Miami, Florida, March 14, 1925, reading as follows:

"Regarding the subscription for stock in the Lansing Theatre Company by George P. Anderson and James Hammell, this stock was subscribed for by them with the understanding that the loan from the Smith estate and the entire transaction was ready to go ahead. Under the existing conditions, I ask that they be released from paying their subscription to the Lansing Theatre stock."

A subscript signed by Ethel C. Hills, notary public of the State of Florida, certifies that this letter was sworn to before her by Butterworth on March 14, 1925. It was marked Exhibit 1 and offered in evidence, but objection to its admission was sustained. Defendant claims this letter was competent as an adverse admission made by the company through its president. At the time that letter was written, the theatre company and its assets were in the hands of a receiver acting under direction of the court. Before the receiver was appointed Butterworth had abandoned the project in a foundering financial condition and left to engage in other enterprises in another State. He did not sign the letter as president of the company, and if he had there is no proof or presumption under the circumstances shown that he was authorized to make any conditions or concessions changing the terms of this written contract which expressly provides that "No statement or condition, not contained herein * * * shall be binding or obligatory upon either party." Butterworth is not shown to have taken any part in preparing this con-

tract or in soliciting defendant's subscription, or to have been present when it was signed by the latter. Defendant's testimony indicates that it was both prepared and signed in Butterworth's absence. We find no error in refusal of the court to admit the letter in evidence. It was an effort along the lines of which it is said in *Upton, Assignee,* v. *Tribilcock,* 91 U. S. 45:

"Equally unsound is the opinion, that the obligation of a subscriber to pay his subscription may be released or surrendered to him by the trustees of the company. This has been often attempted, but never successfully. The capital paid in, and promised to be paid in, is a fund which the trustees cannot squander or give away. They are bound to call in what is unpaid, and carefully to husband it when received."

Appellant's second and third condensed assignments involve the negative and affirmative of directed verdicts and turn mainly on allied propositions.

Defendant's counsel strenuously contend that the circuit court of Ingham county had no power to assume jurisdiction over this matter for any purpose under the petition pursuant to which it appointed plaintiff receiver, as its expressed primary purpose and prayer was for dissolution of a Delaware corporation, and only the courts of that State have jurisdiction to dissolve it. Against this, it is urged for plaintiff that the jurisdiction of the court to appoint a receiver is not open to attack in this collateral proceeding, and cite *Detroit Trust Co.* v. *Lawrence,* 235 Mich. 136, as conclusive, leaving "nothing for argument" upon that question. What is said relative to collateral attack in the *Lawrence Case* is not to be questioned as applied to the situation there presented, which involved the validity of an order appointing a receiver for a domestic corporation, as to which the inherent powers of the courts of chancery are generally recognized, including dissolution. It is textbook law that the courts

of one State cannot dissolve a corporation created by another State. 3 Cook on Corporations (8th Ed.), 2304. In the petition under which plaintiff was appointed, the prayer for dissolution of this foreign corporation seems to have been ill advised. Its legal domicile was exclusively in the State of its creation. As a legal entity it could only be dissolved by the courts of that State, regardless of what business it did in other States. Any attempt of the court of chancery in this State to dissolve this foreign corporation would seem to be so palpably an attempt to usurp the powers of a foreign jurisdiction without color of authority as to be held a nullity even when called to the court's attention in a collateral proceeding.

But it does not follow that because the prayer for dissolution was idle the court acquired no jurisdiction to appoint a receiver under the petition filed. The courts of one State may appoint a resident receiver of the corporate assets of an insolvent or dormant foreign corporation which are within its jurisdiction. 5 Cook on Corporations (8th Ed.), 3941; 1 Clark on Law of Receivers, 245, 499; *vide,* also, *Grand Rapids Trust Co.* v. *Carpenter,* 229 Mich. 491. The petition also prays for a receiver to take possession and conserve the assets of this corporation in the State of Michigan, and to exercise under direction of the court the usual powers of a receiver appointed for that purpose. It also asks for an injunction restraining suits against the corporation or otherwise interfering with its property in possession of said receiver. All this the court could do under its inherent chancery powers, and that is all the court below has yet done, so far as disclosed by this record.

Beyond naming it as the Lansing Theatre Company, plaintiff's pleadings fail to disclose the legal nature of that entity. While shown to be a foreign corporation, with its legal genesis and habitat as such in the

State of Delaware, it was conceived and promoted in Lansing, Michigan, for construction of a theatre building in that city, where its office, officers and assets have all been located, and its business conducted. Its activities have consisted of securing a 50-year lease of a site at a monthly rental of $300 for the first two years and increasing thereafter, planning and commencing construction upon it of a theatre building at an estimated cost of $150,000, campaigning to sell stock to finance the project and ultimately incurring a delinquent local indebtedness beyond its available resources of at least $16,000, as undisputed claims of its creditors filed with the receiver show. No claim is made that it has any assets, or ever did any business beyond incorporating, outside of this State. In its efforts at financing, officers and agents of the company campaigned from time to time during three years or more in sale of its stock, principally to people in and around the city of Lansing, but failed in securing either subscriptions or in borrowing sufficient means to anywhere near finance the undertaking. It reached a point of expectation where construction of the proposed building was begun on its leased site on August 4, 1923. Between then and some time in March, 1925, it expended in such construction for labor and building material about $46,000, when its money and credit were exhausted and construction necessarily suspended. It was no longer able to carry its lease, which was subsequently forfeited, and its investment in building on the leased property went with it to the lessors.

It is next urged for defendant that, not having domesticated as a foreign corporation under our laws (2 Comp. Laws 1915, § 9063 *et seq.*), the theatre company could not legally carry on its business within the State while it admittedly assumed to do so, and all contracts relative to the business it was unlawfully conducting here were illegal, void and unenforceable,

including those for sale of stock. This may be conceded to be true as a general proposition, excepting the sale of its stock when so authorized by the State securities commission under our so-called "blue sky law" (3 Comp. Laws 1915, § 11945 *et seq.*).

It is distinctly stated in the sworn petition for appointment of a receiver that the theatre company is a Delaware corporation and had complied with the laws of this State authorizing the listing and sale of its stock and with its requirements for reports to the securities commission. Such being the situation, its valid contracts for the sale of its stock are not invalidated by its otherwise illegally carrying on its business within the State contrary to our domestication law. One is not in any way dependent upon the other. Either may be lawful or unlawful according to whether or not the applicable act has been observed. *Edward* v. *Ioor,* 205 Mich. 617 (15 A. L. R. 256).

Defendant's claim that his written contract of subscription is void because of what was represented to and promised him as an inducement to sign it by Brown, is based on the two somewhat inconsistent grounds that he was so induced by Brown's false statement of the fact that a $50,000 loan had been secured by the company from Mrs. Smith, fee owner of the leased site, and also by the agreed condition that the contract would not be binding upon him until the $50,000 had been loaned it by Mrs. Smith. We infer from the drift of argument in his counsel's brief that a conditional delivery is relied upon.

Defendant lived in Lansing and was president of the Brick & Supplies Corporation, which carried on an extensive business there in building supplies. His witness Hammell was secretary and treasurer of said company. They were both manifestly wide awake to what was going on in building activities and looking out for business in that connection. Each made a $500 subscription for stock in the theatre company

on January 16, 1923. The printed form of subscription each signed contained these significant provisions:

"It is understood and agreed:

"That this subscription shall not be binding until construction work is started on the company's site on Capitol avenue and Allegan street.

"When said construction work has started I agree to pay the above amount as specified.   *   *   *

"No statement or condition, not contained herein, nor alteration hereof, shall be binding or obligatory upon either party."

Touching the question of false and fraudulent representations by the selling agent which induced defendant to subscribe for stock, he was asked in direct-examination and answered:

"*Q.* What else was said, if anything?

"*A.* He said he would not start the construction of the building until such a time as the Smith money was available for use.

"*Q.* Upon that understanding and agreement did you deliver Exhibit A to him?

"*A.* I did, yes."

Hammell testified on that subject:

"We furnished them material on about the same reason that we subscribed for the stock.

"*Q.* What's that?

"*A.* We supposed that they were going ahead and really supposed that they were going to get this $50,000.

"*Q.* You thought they were going to get the $50,000?

"*A.* Yes, sir. We thought they had money enough to go ahead with it."

Exhibit A is defendant's subscription for stock. He testified to having delivered it upon the understanding and agreement with Brown that work would not start until the anticipated Smith money was available for use, which was in no sense a misrepresentation of an existing fact but a promise, indicating that when

defendant signed and delivered his subscription he knew the project had not been fully financed. He was by no means inexperienced or entirely ignorant of the affairs of this company. He knew and was in touch with its officials, passed almost daily by the site of the proposed building, and was given reason to believe, if he subscribed for this stock, he would be favored in supplying construction material for it when work was commenced, which was in fact done. He was familiar with the company's printed form of subscription, and tells in his testimony of signing one the year before, upon which he took the trouble to write a rider and it was later canceled. He wrote no rider on this one, work was begun upon the building August 4, 1923, and while it was in progress he secured from the company orders for building supplies amounting to about $3,500, for which he insisted upon prompt monthly payments, and when its account became delinquent to the amount of $1,000 he served notice his company would stand it no longer, and if not taken care of a lien on the property would be filed, refused to credit his stock subscription on the account, and pressed for payment until he collected all but $600. When a receiver was appointed he promptly made, filed and proved that claim with the receiver.

It is also strenuously urged for defendant that if his subscription for stock were a valid debt the receiver could not take possession of it as a Michigan asset of the company and seek enforcement of collection in the courts of this State under the general rule that the *situs* of such intangible property is the domicile of the owner, or creditor, which, in the instant case, is an undomesticated foreign corporation domiciled in Delaware.

Debts or choses in action, whether evidenced in the form of notes, bonds, drafts, certificates of stock, subscriptions for stock, etc., or not, are intangible prop-

erty, or property rights, which, in the strict sense of physical location, can have no real domicile or *situs*. But for the practical purposes of business, in dealing with, measuring and enforcing them, it is found essential to impute to them a legal location, by the laws of which they may be treated and enforced. Though correlative, the term "debt" varies in meaning according to whether applied to debtor or creditor. As to the latter it is an asset, a chose in action, or personal right to be paid, which belongs and adheres to him wherever he may be; while to the former it is a liability, obligation to pay, or indebtedness against, upon or following him, wherever he may go. Out of this situation much learned legal controversy has developed touching whether the *situs* of a debt should be that of the creditor or debtor. The authorities are not in harmony upon that subject, and many theories have been advocated (Minor on Conflict of Laws, 286 *et seq.*). It is said of them in 1 Wharton on Conflict of Laws (3d Ed.), 791: "No more embarrassing question arises than that which concerns the *situs* of debts." It may fairly be said that the weight of modern authority tends to the general proposition that the legal *situs* of a debt is with the creditor; but various exceptional cases are recognized where that abstract proposition is inapplicable. The surrounding facts and circumstances so show as applied to this debt. Conceding the theoretical legal *situs* of the chose in action arising out of this contract of subscription was with the creditor, the actual *situs* of this debt was and is in this jurisdiction, where the debtor resides. The contract creating it was made here. From the time this debt was incurred until the receiver was appointed and this case tried, the creditor could only enforce this chose in action here. All attending incidents and essential elements surrounding this personal contract were and are localized in this jurisdiction. Though an outlaw except for

sale of its stock, this foreign corporation was physically localized in Lansing.    It was promoted and organized for the express purpose of engaging in business there. Its office, clerical force, officers and all its property were there.    All its business activities were carried on and all its debts incurred there so far as shown. The only disclosed connection it ever had with its legal *situs* in Delaware was to file its articles of foreign incorporation there.

Defendant's technical objections as a debtor against the validity of business done by the theatre company in this jurisdiction, the appointment of a receiver and his authority, are in marked contrast with his previous attitude from a creditor standpoint, even to proving his company's claim before the receiver.    As to most of his contentions along that line, the equitable doctrines of both estoppel and laches are of some significance.

It is further urged that in any aspect of the case defendant's evidence as to fraudulent inducement made an issue of fact for the jury and reversible error was committed in not submitting that issue to the jury. We are not prepared, on this record, to hold that in any event the court would err in directing a verdict for plaintiff, but defendant is not in a position to raise that question.    Both parties unconditionally asked a directed verdict.    The loser cannot renege.  *St. Mary's Power Co.* v. *Water-Power Co.*, 133 Mich. 470; *Culligan* v. *Alpern*, 160 Mich. 241; *Germain* v. *Loud*, 189 Mich. 38; *Kyselka* v. *Assurance Co.*, 194 Mich. 430; *City National Bank* v. *Price's Estate*, 225 Mich. 200.

The judgment will stand affirmed.

SHARPE, C. J., and BIRD, SNOW, FELLOWS, WIEST, CLARK, and McDONALD, JJ., concurred.