**Ngoc Quang TRINH, Plaintiff,**

v.

**CITIBANK, N.A., Defendant.**

**No. 84–CV–2794–DT.**

United States District Court,
E.D. Michigan, S.D.

Dec. 20, 1985.

Lawrence C. John, Detroit, Mich., for plaintiff.

Mason, Steinhardt & Jacobs by John E. Jacobs, Southfield, Mich., Shearman & Sterling by Jennifer Freeman, New York City, for defendant.

## OPINION

GILMORE, District Judge.

I

This is an action on a debt by which plaintiff seeks the return of deposits made in 1971 by his father into a joint bank account in Citibank, Saigon, Vietnam.

On July 25, 1974, Quang Quy Trinh, plaintiff's father, opened a "Golden Pass Book Account" at Citibank Saigon, a branch of defendant Citibank, N.A. The account was a joint account in his name and the name of his son, Trinh. The initial deposit was of two million piasters. On October 25, 1974, Trinh's father made a deposit of one million piasters.

At the time Trinh's father opened this account, Trinh was a student in Michigan. He never returned to Vietnam. He became a United States citizen in 1979. Trinh testified that his father told him about the account and that he understood the account was for him and for his education.

On April 24, 1975, Citibank Saigon closed its operations, leaving its keys at the U.S. Embassy. American and Vietnamese employees of the bank fled the country. On April 30, 1975, the South Vietnamese government in Saigon fell. On May 1, 1975, the revolutionary forces announced their victory and the creation of a Provisional Revolutionary Government.

Shortly after the fall of Saigon, plaintiff's father was placed in a re-education camp. After his release in 1980, he sent the Citibank Saigon passbook to his son in Michigan. In May 1980, Trinh called the International Division of Citibank in New York to inquire about the deposit. Trinh was told that the National Bank of Vietnam was now responsible for the deposit. On November 5, 1980, Trinh wrote to Walter Winston, Chairman of Citibank, expressing dissatisfaction with this reply, and K.S. Lee, of Citibank, replied on November 17, 1980 that the National Bank of Vietnam was responsible for the Golden Passbook deposit.

Citibank argues that the parent bank is not liable for deposits placed in its foreign branch since the branch is a separate entity. While this is generally true as long as the branch remains open, it ceases

to be true if the branch closes or wrongfully refuses to return a deposit. The leading case of *Sokoloff v. National City Bank,* 239 N.Y. 158, 145 N.E. 917 (1924), established the principle that the home office of a bank is liable on a deposit placed in its foreign branch when the branch has wrongfully failed to return the deposit. *See also* Heininger, *Liability of U.S. Banks for Deposits Placed in Their Foreign Branches,* 11 Law and Pol.Int'l Bus. 903, 926 (1979), and *Sokoloff v. National City Bank,* 130 Misc. 66, 224 N.Y.S. 102 (Sup.Ct.1927), *aff'd* 250 N.Y. 69, 164 N.E. 745 (1928).

The principles of *Sokoloff* have recently been applied by the Second Circuit in a case very similar to the case at bar. In *Vishipco Line v. Chase Manhattan Bank, NA,* 660 F.2d 854 (1981), one individual and several corporate plaintiffs sought the return from Chase Manhattan Bank in New York of deposits that had been made in Chase's Saigon branch prior to the fall of South Vietnam. Chase left Vietnam on the same date as Citibank under similar circumstances. The legal arguments presented, as well as the facts of the two cases, are similar.

The *Vishipco* Court found Chase liable on the deposits in question. This Court finds the reasoning in *Vishipco* persuasive. As in *Vishipco,* the bank in this case is in the relationship of debtor to its depositor. When Citibank Saigon closed its doors without warning, the parent bank became liable on the deposit. Nonetheless, Citibank argues that it is relieved of this liability by the Vietnamese law of *force majeure,* by the assumption of its liabilities by the National Bank of Vietnam, and by the confiscation of Trinh's account. Although these arguments failed in *Vishipco, supra,* Citibank argues that its situation is distinguishable and that, therefore, these defenses should succeed here. The Court rejects this argument for the reasons stated below.

## II

■ Jurisdiction is founded both upon diversity and upon the existence of a federal question. Trinh is a citizen of Michigan, and Citibank is a national bank located in New York. National banks are treated as citizens of the state in which they are located. See 13B C. Wright and A. Miller, *Federal Practice and Procedure* § 3571 (1984). The $10,000 amount in controversy requirement is met because plaintiff claims that as of November 5, 1980 (the date of plaintiff's demand letter), the original 3,000,000 piaster deposit was worth $12,333. Defendant's argument that the amount in controversy is not met because the piaster is valueless cannot prevail since plaintiff's claim is made in good faith and it does not appear to a legal certainty that the claim is really for less than $10,000. *St. Paul Mercury Indemnity Co. v. Red Cab Co.,* 303 U.S. 283, 58 S.Ct. 586, 82 L.Ed. 845 (1938).

In addition, the Court has federal question jurisdiction over this action under 12 U.S.C. § 632, which states in pertinent part:

Notwithstanding any other provision of law, all suits of a civil nature at common law or in equity to which any corporation organized under the laws of the United States shall be a party, arising out of transactions involving international or foreign banking, or banking in a dependency or insular possession of the United States, or out of other international or foreign financial operations, either directly or through the agency, ownership, or control of branches or local institutions in dependencies or insular possessions of the United States or in foreign countries, shall be deemed to arise under the laws of the United States, and the district courts of the United States shall have original jurisdiction of all such suits; and any defendant in any such suit may, at any time before the trial thereof, remove such suits from a State court into the district court of the United States for the proper district by following the procedure for the removal of causes otherwise provided by law.

Defendant is a corporation organized under the laws of the United States, and this case arises out of a transaction involving foreign banking, or banking in a branch in a foreign country.

### III

Defendant has attempted to distinguish the case at bar from *Vishipco, supra,* based in part on choice of law principles. Therefore, analysis of defendant's position must begin with a discussion of the choice of law rules that apply.

Plaintiff and defendant both correctly argue that federal courts sitting in diversity apply the choice of law rules of the forum state. *Klaxon Co. v. Stentor Electric Manufacturing Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). However, defendant further argues that, because there is federal question jurisdiction here, and because in federal question cases federal common law choice of law rules apply, *Corporacion Venezolana de Fomento v. Vintero Sales Corp.,* 629 F.2d 786 (2d Cir. 1980), *cert. denied* 449 U.S. 1080, 101 S.Ct. 863, 66 L.Ed.2d 804 (1981), this Court must apply federal common law choice of law rules.

It is not clear that, when a federal court has both diversity and federal question jurisdiction, federal common law choice of law rules must be applied. In *Corporacion Venezolana de Fomento v. Vintero Sales Corp., supra,* the court had only federal question jurisdiction under 12 U.S.C. § 632. The court held it did not have diversity jurisdiction because of the presence of aliens as parties on both sides of the case. The court did not say what result would obtain if it had *both* federal question and diversity jurisdiction. The court did say that "[w]ere this a diversity case, *Klaxon* (citation omitted) would require that we look to the choice of law doctrines of the forum state." *Id.* at 795. However, since it had only federal question jurisdiction, it looked to federal common law choice of law doctrine.

In *Citibank, N.A. v. Benkoczy,* 561 F.Supp. 184 (SD Fla 1983), Citibank sued Florida residents on a guarantee of obligations of a Haitian corporation. The court did not state whether it had diversity jurisdiction. The court held that it had jurisdiction under 12 U.S.C. 632, and applied federal common law choice of law rules. The court noted that, "[w]ere this a diversity case, the decision as to what substantive law to apply would be controlled by the conflicts of law rules of the forum state, Florida." The court did not explicitly state whether it applied federal choice of law rules *because* it had no diversity jurisdiction or in spite of having diversity jurisdiction.

Research has not disclosed any case exactly on point. However, *Stud v. Trans International Airlines,* 727 F.2d 880 (9th Cir.1984) suggests that, where diversity jurisdiction exists in addition to federal question jurisdiction, the forum state's choice of law rules can be used. The *Stud* court said:

> Because our jurisdiction is based not simply on the existence of a federal question under the version of the Warsaw Convention in force in the United States, (citation omitted), but on diversity of citizenship as well, we are not compelled to apply the United States version of the Convention. Instead, we use the choice of law rules of California, the state in which this action was filed, to determine the applicable law.

*Id.* at 881.

And *Cutler v. Bank of America National Trust & Savings Association,* 441 F.Supp. 863, 865 (N.D.Cal.1977), in a case in which jurisdiction was based on 12 U.S.C. § 632, applied the choice of law rules of the forum because "[I]t is established law that the source of the right, rather than the basis of federal jurisdiction invoked, controls determination of the applicable law ..." *Id.* at 865.

■ Of course, the question of whether to apply Michigan's choice of law rules or

federal common law choice of law rules only matters if they would lead to a different result in this case. Plaintiff argues that Michigan's choice of law rules would require this Court to apply Michigan law to his claim. Defendant argues that both Michigan and federal common law choice of law rules require this Court to apply the law of Vietnam.

As to the federal common law choice of law rules, defendant cites *Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank,* 731 F.2d 112 (2d Cir.1984). In that case, which arose under 12 U.S.C. § 632, the court applied the federal choice of law rules as follows: As to the issue of restitution, the court analyzed the relationship of the occurrences and parties to New York in accordance with the Restatement (Second) Conflict of Laws § 221 (1971) and concluded that New York law governed because the banking relationship between the parties arose there, the banking transactions occurred there, Chase's principal office was located there, the plaintiff had an office there, and Chase received plaintiff's money there.

Here, Citibank notes only the first relationship, i.e. that the banking relationship was in New York. However, the Restatement (Second) Conflict of Laws, § 188 and § 221 (1971) suggest that a whole range of contacts be examined, as indeed the *Aaron Ferer* court did. In the case at bar, the relationship does not point as unequivocally to Vietnam as it pointed to New York in *Aaron Ferer.* The banking relationship did begin in Vietnam, the transactions took place in Vietnam, and defendant Citibank did receive plaintiff's money in Vietnam. However, Citibank's principal office is in New York, and it is no longer located in Vietnam at all. Plaintiff resides in Michigan, and the "thing" involved here—the debt—is no longer located in Vietnam (under the rule of *Vishipco, supra*). Although this case has contacts with both New York and Vietnam, the more significant contacts are with Vietnam.

Defendant argues, and plaintiff admits, that the general Michigan choice of law rule is that a contract is governed by the law of the place where it is made. *Wells v. 10–X Manufacturing Co.,* 609 F.2d 248 (6th Cir.1979). There, the general rule would point this Court to the law of Vietnam. Plaintiff's cases cited for exceptions to this rule do not obtain here. Plaintiff cites *Mills v. Anderson,* 238 Mich. 643 (1927) for the principle that where a creditor is domiciled in Michigan, Michigan courts apply Michigan law. However, in that case, the court found the situs of the debt in issue to be with the *debtor* in Michigan. Plaintiff's other cases deal with the question of the situs of a debt, but not with the question of choice of law.

Michigan's adoption of the Uniform Commercial Code provides the explicit statutory choice of law rule. M.C.L.A. § 440.4102 states:

> (2) The liability of a bank for action or non-action with respect to any item handled by it for purposes of presentment, payment or collection is governed by the law of the place where the bank is located. In the case of action or non-action by or at a branch or separate office of a bank, its liability is governed by the law of the place where the branch or separate office is located.

Plaintiff ignores this provision. Defendant cites it without analyzing it. There are no Michigan cases annotated under it. Heininger, *Liability of U.S. Banks For Deposits Placed in Their Foreign Branches, supra,* discusses this UCC provision as "pointing" to choosing the law of the place where the branch is located.

Plaintiff's claim that the law of Michigan applies must clearly be rejected. Michigan and federal choice of law rules require application of either the law of Vietnam or the law of New York. Under the federal choice of law analysis, Vietnam has the most significant contacts with the action. Michigan common law and M.C.L.A. 440.-4102(2) indicate that the law of Vietnam should be applied in this case.

## IV

The choice of law determination that the law of Vietnam applies does not distinguish this case from *Vishipco, supra.* In *Vishipco* the court applied the law of New York to the "underlying obligation," and the law of Vietnam to Chase Manhattan's defenses. There, defendant Chase Manhattan Bank argued that, since New York's choice of law rules called for the case to be governed by the law of Vietnam, and since the plaintiffs had failed to prove they were entitled to recover under Vietnamese law, plaintiff's claims were dismissible under Fed.R. Civ.P. § 44.1. The Second Circuit rejected that argument, holding:

> While, as the Advisory Committee's notes to Rule 44.1 make clear, a court is still permitted to apply foreign law even if not requested by a party, we believe that the law of the forum may be applied here, where the parties did not at trial take the position that plaintiffs were required to prove their claims under Vietnamese law, even though the forum's choice of law rules would have called for the application of foreign law. This reflects the view adopted by ourselves and other federal courts since 1966.

*Id.* at 860.

The Court went on to say:

> While Chase invoked foreign law under Rule 44.1 with respect to its own affirmative defenses only, neither party invoked foreign law with respect to Chase's basic obligations to its depositors and holders of certificates of deposit. Nor did Chase ever suggest that under Vietnamese law those obligations would not have formed a basis for recovery.

*Id.* at 860.

The court then held that it would apply New York law to Chase's underlying obligation, and that under New York law, unless relieved by a defense, Chase was obligated to pay plaintiffs the sums deposited with it.

In the present case, Citibank argues that, unlike Chase in *Vishipco*, it has, throughout pre-trial and at trial, taken the position that Trinh must prove his claim under Vietnamese law. Citibank further argues that Trinh cannot do so because the Vietnamese law of *force majeure* applies to Trinh's claim and relieves Citibank of liability on the deposit. The Court does not agree.

The instant case is not procedurally or factually distinguishable from *Vishipco* on this point. In the same sense that the *Vishipco* court says Chase never invoked foreign law as to its underlying obligation on the deposits, Citibank, in the present case, has never argued that, under the law of Vietnam, Trinh's deposits do not equal a debt of the bank or form an underlying basis for recovery.

■ Furthermore, the *Vishipco* court did address the argument that *force majeure* relieved Chase of liability. The court addressed this argument as an affirmative defense to which it applied the law of Vietnam. This is essentially no different from what Citibank asks this Court to do. The *Vishipco* court rejected Chase's arguments, which are directly analogous to the arguments Citibank makes here, as follows:

> Chase next argues that under Vietnamese law its failure to repay plaintiffs' deposits in the period prior to May 1, 1975, was not a breach of its deposit contract, because the conditions prevailing in Saigon at the time rendered payment impossible. In support of this argument, *Chase cites various sections of the South Vietnamese Civil Code which excuse performance under various extenuating circumstances*, as well as the provisions included in the deposit contracts used by the Saigon branch which purported to discharge the bank's responsibility for losses to depositors resulting from a variety of unexpected and uncontrollable sources.
>
> This argument must be rejected for the reasons that impossibility of performance in Vietnam did not relieve Chase of

its obligation to perform elsewhere. By operating in Saigon through a branch rather than through a separate corporate entity, Chase accepted the risk that it would be liable elsewhere for obligations incurred by its branch.

. . . . .

U.S. banks, by operating abroad through branches rather than through subsidiaries, reassure foreign depositors that their deposits will be safer with them than they would be in a locally incorporated bank. *Heininger, supra,* at 911–12. Indeed, the national policy in South Vietnam, where foreign banks were permitted to operate only through branches, was to enable those depositing in foreign branches to gain more protection than they would have received had their money been deposited in locally incorporated subsidiaries of foreign banks. Chase's defenses of impossibility and *force majeure* might have succeeded if the Saigon branch had been locally incorporated or (more problematically) if the deposit contract had included an explicit waiver on the part of the depositor of any right to proceed against the home office. But absent such circumstances the Saigon branch's admitted inability to perform did not relieve the Chase of liability on its debts in Saigon, since the conditions in Saigon were no bar to performance in New York or at other points outside of Vietnam.

*Id.* at 863–64.

Thus, Citibank has failed to meaningfully distinguish itself from *Vishipco.*

■ Even if the Court accepts Citibank's proposition that the *force majeure* provisions of the Vietnamese Commercial Code apply to the underlying obligation of Citibank on the deposits it accepted, an analysis of those provisions applied to the facts of this case indicates that they do not relieve Citibank of liability.

The relevant provisions of Vietnamese law argued by Citibank are as follows:

The depositary is not liable for accidents or risks resulting from *force majeure,* unless previously he has been given notice to return the deposited object.

Article 1206 of Vietnam Commercial Code.

The debtor does not have to pay damages if his violation or non-performance of contractual obligations is due to a fortuitous cause or a case of *force majeure.*

Article 701 of the Vietnam Commercial Code.

Mr. Ta Van Tai, Citibank's expert witness on Vietnamese law, testified that *force majeure* is a French term to describe acts of God, acts of government, and any fortuitous cause beyond the control of the parties in the contract. Defendant offered Mr. Tai's opinion that this Vietnamese law applied to relieve Citibank of liability on its deposits when it closed its doors and left Vietnam on April 25, 1975.

This Court is not bound by Mr. Tai's opinion as to the application of Vietnamese law to this case. The Vietnamese *force majeure* law does not relieve Citibank of liability on its deposits in this case for the following reasons.

First, Citibank's closure and departure from Vietnam was clearly not due to an act of God. Neither was it due to an act of government. Citibank closed its doors on April 24, 1975, a week before the fall of South Vietnam. In fact, it is clear from the April 25, 1975 joint communique of the South Vietnamese Finance Ministry and the National Bank that the government considered Citibank's action to be illegal. A news report of the communique, provided in defendant's exhibit 29, states that those two agencies announced "the Chase Manhattan Bank, the First National City Bank, and the Bank of America had closed temporarily without asking for permission from our government." The report went on to state, "The Finance Ministry and the National Bank will apply sanctions against these banks according to law." Clearly, the government of South Vietnam did not

close the bank. And, of course, the revolutionary forces had not yet gained control and thus did not close Citibank. Citibank closed itself.

Citibank presented a great deal of evidence as to the chaotic situation in Saigon in April, and as to its humanitarian efforts to remove its Vietnamese employees from the country before the capitol fell. The gist of Citibank's argument is that this evidence shows that the closing of Citibank falls within the third definition of *force majeure*, i.e. that Citibank closed due to a fortitious cause outside of its control. This fortitutious cause, Citibank argues, was the impending collapse of Saigon and the danger posed by the new regime to Citibank's Vietnamese employees.

However, Citibank's response to the political situation in Vietnam was a voluntary choice. Banks do not have to close in the face of impending revolutions, and they do not always do so. The decision to close was not beyond Citibank's control.

Citibank's position seems to be that, because the military and political situation of Vietnam was out of its control, its response to the situation (the decision to close) was also out of its control. If this were the meaning of *force majeure*, then, by analogy, *force majeure* would apply to relieve a bank of liability when changes beyond its control in world financial markets made a branch unprofitable, and it therefore decided to close the branch and cut its losses. This cannot be the meaning of *force majeure*.

For the same reasons, Citibank's defense based on the *force majeure* clause in its deposit agreement must also fail even though it is enforceable under Vietnamese law.

Thus, Citibank has not meaningfully distinguished this case from *Vishipco, supra,* and the application of Vietnamese law does not relieve Citibank of its liability on Trinh's deposit.

## V

█ Citibank's proofs regarding the assumption of its assets and liabilities by the National Bank of Vietnam do not distinguish this case from *Vishipco, supra.*

Citibank argues that it is relieved of liability on Trinh's deposit because the National Bank of Vietnam assumed its assets and liabilities and became its successor in interest. Since this argument was not made by Chase in *Vishipco*, Citibank argues it has distinguished itself from *Vishipco* sufficiently to call for a different result.

Chase did argue in *Vishipco* that the plaintiff corporation had been nationalized by the revolutionary administration and that, therefore, the government of Vietnam, rather than the exiled corporate directors, was the successor in interest of the corporations with standing to sue. The *Vishipco* court said that, in order to prove successorship in interest, the defendant had to prove that the government had stepped into the corporation's shoes and formally assumed both its assets and liabilities. In the case at bar, Citibank argues it has proved that the National Bank of Vietnam formally assumed both its assets and liabilities and became the successor in interest to Trinh's deposit.

Citibank's argument fails for two reasons. First, it is doubtful whether the National Bank of Vietnam could have assumed liability for Citibank's debt to Trinh since the *situs* of the debt was no longer in Vietnam at the time that Citibank claims the assumption took place. See discussion of confiscation, *infra,* at pp. 1535–36.

Second, even if the National Bank of Vietnam could have assumed Citibanks' liabilities, Citibank has not proved that it did so.

Citibank relies on three published announcements. The first of these, an April 25, 1975 joint communique of the National Bank and the Finance Ministry, is irrelevant since it is an announcement of the old regime before it fell to the Communists. Although the Revolutionary Administration allowed the National Bank of Vietnam to

resume operation under the same name, Citibank's own proofs indicate that the bank was completely reorganized to conform to the revolutionary government's policies. There is no reason to believe that any statement or promise of the old regime was binding on the new.

Citibank further relies on newspaper announcements, dated September 7, 1975 and September 14, 1975, that the National Bank guaranteed it would gradually repay savings accounts to workers and laboring people. However, Citibank's proofs with regard to the National Bank's position on the deposits in foreign banks is equivocal at best. The June 17, 1975 communique contained in Citibank's Exhibit 33 states:

> With regard to previous deposits, securities and savings, all debtor banks, including *all foreign banks, must accept responsibility for their liquidation and the submission of their records to the Vietnam National Bank. After settlement with banks*, the Vietnam National Bank will conduct reviews and make known authorization to use deposits in accordance with production and commercial requirements and will pay out savings to workers and people according to new banking regulations. The Vietnam National Bank will not accept responsibility for improper or illegal activities by private banks.

The September 7, 1975 newspaper article relied on by Citibank also states:

> As regards persons wanting to withdraw money on deposit at a bank for use in agricultural, industrial or commercial development while *awaiting the settlement of accounts with the private banks*, the National Banks of Vietnam will study and satisfactorily meet loan requests for reasonable business and production needs.

> .    .    .    .    .

> At present, the National Bank is allowing the various private banks to operate under the management of the national bank so that they can carry out their business operations *while settling their accounts,* such as collecting outstanding loans and returning savings accounts in accordance with regulations.

> *As regards banks whose owners have fled the country, the national bank will inventory and re-evaluate their assets and settle their accounts in order to determine their ability to return the savings of account holders; the bank will issue a notice concerning these persons.* (emphasis added)

Finally, the newspaper story of September 14, 1975 describes as a "very correct type of thinking" a willingness to write off as a loss treasury bond investments and "losses in bank money that went overseas and losses due to incorrect operation and to corruption in the private banks." These announcements do not indicate an unqualified assumption of all liabilities. In particular, there does not appear to be any clear assumption of the liabilities of banks that fled the country.

Finally, even the testimony of Citibank's witness Tai is that the National Bank had promised to repay savings accounts only to selected groups of people (workers). There is nothing to indicate that the National Bank assumed liability for the account of Trinh's father, a senator of the fallen regime. In fact, Citibank argues this account was confiscated.

The Court finds as a matter of fact that on this record Citibank has failed to prove that the National Bank of Vietnam assumed its liability on Trinh's deposit and became its successor in interest.

## VI

Citibank's proofs as to confiscation of the account do not distinguish this case from *Vishipco, supra.*

Citibank also argues that it is distinguishable from *Vishipco* because it has succeeded in proving that the bank and the account at issue were confiscated whereas

Chase in *Vishipco* failed to prove confiscation. This argument fails for two reasons. First, there is no significant difference between the circumstances of Chase's and Citibank's departures from Saigon. Chase gave its keys to the French Embassy; Citibank left its keys at the American Embassy with instructions to turn them over to the Vietnamese. The *Vishipco* court found that the French Embassy had turned over Chase's records to the revolutionary government. Citibank, in the case at bar, presented no evidence that the revolutionary government had in fact received its keys and records. There is no basis for Citibank's contention that these facts make its case stronger on the issue of confiscation than *Vishipco*.

██ More importantly, here, as in *Vishipco*, at the time of the confiscation decrees the deposit no longer had its *situs* in Vietnam. The reasoning in *Vishipco* is clear and persuasive. A debt is not located in a foreign state unless that state has the power to enforce or collect it, which depends on jurisdiction over the debtor. Citibank no longer had any presence in Vietnam, and the revolutionary government had no jurisdiction over it. Hence, the confiscation decrees could have no effect on Citibank's debt to Trinh. *See Vishipco, supra* at 862. As that Court said, quoting a qualified commentator:

> The situs of a bank's debt on a deposit is considered to be at the branch where the deposit is carried, but if the branch is closed, ... the depositor has a claim against the home office; thus, the situs of the debt represented by the deposit would spring back and cling to the home office. If the situs of the debt ceased to be within the territorial jurisdiction of [the confiscating state] from the time the branch was closed, then at the time the confiscatory decree was promulgated, [the confiscating state would] no longer [have] sufficient jurisdiction over it to affect it.... [U]nder the act of state doctrine, the courts of the United States

are not bound to give effect to foreign acts of state as to property outside the acting state's territorial jurisdiction. Heininger, *Liability of U.S. Banks for Deposits Placed in Their Foreign Branches*, 11 Law & Pol.Int'l Bus. 903, 975 (1969) (footnotes omitted)

*Id.* at 862–63.

Citibank's defense that Trinh's account was confiscated must fail, just as the identical defense failed in *Vishipco*. Citibank has failed to distinguish itself from *Vishipco* in any important respect. This Court finds the reasoning in *Vishipco* persuasive, and, for all the reasons stated above, finds Citibank liable to Trinh on the deposit account.

### VII

Both parties agree, and the law is settled, that a United States District Court can award judgment only in dollars. Thus, this Court faces the difficult task of translating the account (which consisted of 3,000,000 piasters on October 25, 1974) into a judgment in dollars.

The difficulty of this task is compounded by the fact that the piaster no longer exists but was replaced by the South Vietnam dong on September 22, 1975. The South Vietnam dong was in turn replaced by the Vietnam dong on May 3, 1978. The difficulty of this task is further complicated by the fact that the piaster was a blocked currency (it could not be taken out of Vietnam) and it is currently illegal to trade in the Vietnam dong.

██ The first question is whether to convert the amount owed into dollars on the day of the breach (as argued by plaintiff) or on the day of the judgment (as argued by defendant). Whether to convert as of the breach day or the judgment day has presented a perplexing problem to federal courts, which have not always reached consistent results. *See* Becker, *The Currency of Judgment*, 25 Am.J.Comp.L. 2 152 (1977).

The Court finds that the answer to this question is governed by three Supreme Court opinions written by Justice Holmes. In *Hicks v. Guinness*, 269 U.S. 71, 46 S.Ct. 46, 70 L.Ed. 168 (1925), a German firm was indebted to an American firm on an account stated in marks on December 31, 1916 and payable to the American firm in the United States. The Court held that the American firm was entitled to recover the value in dollars that the mark had when the account *was stated*, saying:

> The loss for which the plaintiff is entitled to be indemnified is "the loss of what the contractor would have had if the contract had been performed," (citation omitted); it happens at the moment when the contract is broken, just as it does when a tort is committed, and the plaintiff's claim is for the amount of that loss valued in money at that time.

*Id.* at 80, 46 S.Ct. at 47.

However, one year later, in *Deutsche Bank Filiale Nurnberg v. Humphrey*, 272 U.S. 517, 47 S.Ct. 166, 71 L.Ed. 383 (1926), the Court found it erroneous to convert until the time of judgment. In that case, a U.S. depositor in a German bank had demanded his deposit on June 12, 1914. The debt was in marks. The Court said that, unlike the case in *Hicks*, on the date of demand the German bank owed no duty to the plaintiff *under U.S. law*. Thus, the obligation was fixed in marks on the date of demand and took the risk of later currency fluctuations.

In *Zimmermann v. Sutherland*, 274 U.S. 253, 47 S.Ct. 625, 71 L.Ed. 1034 (1927), Justice Holmes resolved the apparent contradiction between *Hicks* and *Deutsche Bank:*

> The decision of the Circuit Court of Appeals was right, and in view of the recent case of *Deutsche Bank Filiale Nurnberg v. Humphrey*, 272 U.S. 517 [47 S.Ct. 166], does not need extended reasoning. Here as there the debt was due and payable in the foreign Country. The only primary obligation was that cre-

ated by the law of Austria-Hungary and if by reason of an attachment of property or otherwise the courts of the United States also gave a remedy the only thing that they could do with justice was to enforce the obligation as it stood, not to substitute something else that seemed to them about fair. *The distinction between the Deutsche Bank Case and Hicks v. Guinness, 269 U.S. 74 [46 S.Ct. 46], is not, as argued, that the plaintiff in Hicks v. Guinness was in the United States, but that, as the court understood the facts, the debt was payable in New York and subject to American law, so that upon a breach of the contract there arose a present liability in dollars.* (emphasis added.)

*Id.* at 255–56, 47 S.Ct. at 625–26.

Thus, where a debt in foreign currency is payable in a foreign country, the judgment day rule applies. This assumes a uniform result whether the suit is brought in the foreign country or in the United States. *See Shaw, Savill, Albion & Co. Ltd. v. The Fredericksburg*, 189 F.2d 952 (2d Cir.1951).

However, where the obligation is payable in the United States, conversion is proper at the rate current at the time of breach. *See Bamberger v. Clark*, 390 F.2d 485 (D.C.Cir.1968).

■ In the present case, the Court has held that the situs of Citibank's debt to Trinh sprang back to the home office when the Saigon branch was closed. Thus, Trinh has a claim against the home office. This is obviously payable in the United States. Also, there is no possibility of a suit in Vietnam to recover the deposit. Thus, under *Hicks, supra*, a present liability in dollars arose when Citibank wrongfully refused Trinh's demand on November 17, 1980. Therefore, the Court will apply the conversion rate in existence on November 17, 1980, the date of the breach.

■ Next, the Court must determine what rate of exchange to apply. Plaintiff

urges the Court to convert the account into dollars at the effective rate of exchange in November 1980, which the evidence showed to be 2.39 Vietnam dongs to the dollar. Citibank urges the Court to convert the account into dollars at the unofficial market rate, which the evidence showed to be 17 Vietnam dongs to the dollar in November 1980.

The Court finds that the proper rate of conversion is the unofficial market rate of 17 dongs to the dollar. Courts have refused to look at official rates of exchange when currencies are blocked or when the official rate otherwise does not apply to the transaction at hand. *See Hughes Tool Co. v. United Artists Corp.*, 279 App.Div. 417, 110 N.Y.S.2d 383 (1952), aff'd 304 N.Y. 942, 110 N.E.2d 884 (1953). *Cinelli v. CIR*, 502 F.2d 695 (6th Cir.1974). Courts instead seek to apply commercial rates of exchange that reflect actual fair market value of foreign currency. Thus, the Court of Appeals for the Second Circuit directed the District Court in the *Vishipco* case (where, as here, there was no New York market rate of exchange since trading in Vietnamese currency is illegal in the U.S.) to determine the "true value" of the piaster and to evaluate the underground market for dollars in Saigon at the date of the breach. *Vishipco Line v. The Chase Manhattan Bank*, 754 F.2d 452 (2d Cir.1985).

In the present case, plaintiff's Exhibit 7, which is the Vietnam dong section of the 1984 World Currency Year Book, together with the testimony of plaintiff's and defendant's experts, showed that an active unofficial or black market in dollars exists in Vietnam, and that the exchange rate of this market in November 1980 was 17 Vietnam dongs to the dollar. This is the proper rate to apply, rather than the effective rate, since the evidence showed that no individual could really trade at the effective rate set by the government of Vietnam.

Next, the Court must determine the interest the account earned. Plaintiff has alleged, but failed to prove, that the ac-count drew 24% interest. Citibank's testimony showed that the account earned 19% interest, compounded daily.

Finally, the Court must trace the piaster deposit through the Vietnam currency conversions decided above. These conversion rates are not in dispute. They are as follows:

| Sept. 22, 1975 | 500 piasters = 1 South Vietnam dong |
| May 3, 1978 | .80 South Vietnam dongs = 1 Vietnam dong |

The Court can now calculate the amount Citibank owes on the account. The starting point is the 3,000,000 piasters shown in the pass book on October 25, 1974.

| October 25, 1974 | 3,000,000.00 piasters |
| September 22, 1975 principal plus interest at 19% compounded daily | 3,584,408.14 piasters |
| September 22, 1975 conversion from piasters to South Vietnam dongs (500 piasters = 1 South Vietnam dong) | 7,168.82 South Vietnam dongs |
| May 3, 1978 principal, plus interest at 19% compounded daily | 11,771.64 Vietnam dongs |
| May 3, 1978 conversion from South Vietnam dongs to Vietnam dongs (.80 South Vietnam dongs = 1 Vietnam dong) | 14,714.56 Vietnam dongs |
| November 17, 1980 principal, plus interest at 19% compounded daily | 23,862.32 Vietnam dongs |
| November 17, 1980 conversion from Vietnam dongs to U.S. Dollars (17 dongs = 1 dollar) | $1,403.67 |

Defendant is ordered to pay plaintiff $1,403.67, plus statutory interest from November 17, 1980.

This opinion consistutes the findings of fact and conclusions of law required by FRCP 52(a).