**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 11a0883n.06

No. 09-1938

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**

*Dec 27, 2011*

LEONARD GREEN, Clerk

VIRGINIA HAUF,

    Plaintiff-Appellant,

v.

LIFE EXTENSION FOUNDATION,

    Defendant-Appellee.

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE WESTERN
DISTRICT OF MICHIGAN

OPINION

_____/

Before:    GILMAN and KETHLEDGE, Circuit Judges; LUDINGTON, District Judge.[*]

THOMAS L. LUDINGTON, District Judge.  Virginia Hauf, the mother of a child diagnosed with brain cancer, purchased shark cartilage supplements from the Life Extension Foundation. Several years later, Hauf contacted the Foundation and offered to endorse its products.  The Foundation sent her a proposed "Testimonial" and a "Standard Release of Testimonials & Photos." Hauf revised the proposed testimonial and returned it to the Foundation.  She also signed and returned the release, which provides that Hauf grants the Foundation the "irrevocable right" to use her "name (or any fictional name)" and her image "in all manners, including composite or distorted representations, for advertising, trade, or any other legal purposes."  It further provides that Hauf releases "any right to inspect or approve the finished product, including written copy."

---

[*]The Honorable Thomas L. Ludington, United States District Judge for the Eastern District of Michigan, sitting by designation.

After the Foundation ascribed a variety of testimonials to Hauf, she brought suit alleging false endorsement, false advertising, and misappropriation of name and likeness under the Lanham Act, the Michigan Consumer Protection Act, and Michigan common law. Based on the unambiguous language of the release, the district court summarily dismissed all of Hauf's claims. We affirm.

**I.**

Virginia Hauf, formerly Virginia Gorka, is the mother of Stephen Barrow. As a child, Barrow was diagnosed with brain cancer; doctors found a tumor in the base of his brain in 1991. After Barrow underwent surgery to remove the tumor, Hauf sought alternative treatments for her son. In May 1991, mother and son traveled from Michigan, where they resided, to Mexico for "immune augmentative therapy." Hauf also started providing her son with shark cartilage supplements.

In 1993, Hauf contacted the Foundation to purchase shark cartilage supplements. The Foundation, a non-profit Florida corporation, supports itself through membership dues, donations, and royalties from products sold through its "Life Extension Buyers' Club." One of its founders, William Faloon, spoke with Hauf about why she was placing the order. After learning her reasons, Faloon asked Hauf whether she would be willing to publish a letter to the editor in the *Life Extension Magazine* recounting her son's story. Hauf agreed. In 1994, Hauf stopped purchasing shark cartilage from the Foundation; she has not purchased any since. Hauf's letter to the editor was published in 1994. Sometime later, she was asked and agreed to publish an updated letter to the editor. The updated letter was published in 1995.

In 2001, Hauf contacted the Foundation again and offered to endorse its products. She wrote: "i would like to get with you on the life extension foundation. i feel your products are wonderful. . . . i would like to work out something with you in regards to recommending your products." A

Foundation employee, Steven Stahl, faxed Hauf two documents, a proposed "Testimonial" based on Hauf's earlier letters to the editor and a "Standard Release of Testimonials & Photos." Believing that the proposed testimonial contained several errors, Hauf crossed out inaccuracies (struck through below), interlineated additions (bracketed below), and faxed the following back to the Foundation:

> ~~In my search for a way to save my son's life, someone referred me to Life Extension.~~
>
> ~~The People at your organization supported my search for different treatment regimens we could try.~~ My thirteen year old son was diagnosed with brain cancer (astrocytoma grade 3) on January 21, 1991, however, they were not able to remove all of it. I sent his records to Sloan Kettering, Mayo Clinic, and several specialists. I also sent his records to a world renowned brian surgeon and his reply was the same as everyone else, "I'm sorry, but there is nothing more to be done. Besides radiation or experimental chemotherapy, this may only give him a little extra time. Just take your son home, make him comfortable, and love him for the remainder of his time."
>
> Steve's prognosis was very grim, six months at the most. I started him on high doses of vitamin C, E, beta carotene, shark cartilage, garlic, selenium, and other nutrients and minerals. I found out about a clinic called the IAT West Clinic [Dr. Gustavo Andrade] ~~which pioneered a treatment called~~ Immuno Augmentative Therapy. Finally, I decided to take him to Mexico to undergo this type of treatment. Steve has been tumor free for ~~the last year~~ [0 yrs.]. Steve is doing very well. He ~~is~~ [was] back on the track team, wrestling team and football team. . . Steve has no limitations at all [and leads a very productive life.]
>
> EPILOGUE: The tumor was eradicated completely within ~~two~~ [1] years. Steve has been free from cancer for the last ~~8~~ [9] years. The IAT West Clinic is listed in LIFE EXTENSION'S Directory of Innovative Medical Clinics.

These revisions were necessary, Hauf asserts, to accurately recount her son's story.[1]

---

[1] The surgeon who operated on Barrow on January 21, 1991, Dr. Mark Meyer, disagrees. He testifies that the surgery completely eradicated Barrow's tumor and that, moreover, he never told Hauf or Barrow that Barrow had only six months to live—and when asked about Barrow by the Make-a-Wish Foundation, Dr. Meyer informed them that Barrow's condition was not life-threatening.

Dr. Andrade, like Dr. Meyer, similarly disagrees with Hauf's version of events. He testifies that he recommended radiation and chemotherapy for Barrow, that the mother and son rejected his advice, and that he never told them that Barrow had only six months to live if he did not receive treatment. Dr. Andrade also notes that Hauf did not show him the MRIs and CAT scans taken of Barrow following the January 21, 1991 surgery, which Dr. Andrade now agrees show Barrow "was recovering a hundred percent."

In a phone conversation with Stahl, Hauf alleges, she also explained that she was supplying the testimonial for publication in a single issue of *Life Extension Magazine* and that it was not to be used for monetary gain. According to Hauf, Stahl assured her that her requests would be respected and that she would be allowed to view and approve the testimonial before it was published. Hauf then signed and returned the following release:

### STANDARD RELEASE OF TESTIMONIALS & PHOTOS

I . . . do hereby give LIFE EXTENSION FOUNDATION AND ALL ITS BUSINESS AFFILIATES, its assigns, licensees, and legal representatives the irrevocable right to use my name (or any fictional name), picture, portrait, digital image, or photograph in all forms and media and in all manners, including composite or distorted representations, for advertising, trade or any other legal purposes, and I waive any right to inspect or approve the finished product, including written copy, that may be created in connection therewith.

I am over eighteen (18) years of age and have read the above release and authorization prior to its execution.

Instead of being published in a single issue of *Life Extension Magazine*, the testimonial was published more than forty times in various Foundation materials between 2001 and 2005. Its language was modified as well. For example, the following sentence was added: "Through your organization I found out about a treatment called Immuno Augmentative Therapy." Additionally, notwithstanding Plaintiff's striking through "In my search for a way to save my son's life, someone referred me to Life ExtensionTM" and "The People at your organization supported my search for different treatment regimens we could try," these sentences were included in several versions of the testimonial. At Hauf's request in 2005, the Foundation ceased publishing testimonials bearing Hauf's name.

In 2006, Hauf and Barrow brought suit against the Foundation and Faloon, alleging several claims arising from the publication of the testimonials. Specifically, Hauf and Barrow brought: (1) a false-endorsement claim under the Lanham Act, 15 U.S.C. § 1125(a)(1)(A); (2) a false-advertising claim under the Lanham Act, 15 U.S.C. § 1125(a)(1)(B); (3) an invasion-of-privacy claim alleging misappropriation of names and likeness for commercial benefit under Michigan common law; and (4) a false-advertising claim under the Michigan Consumer Protection Act, Mich. Comp. Laws § 445.903(1). The Foundation and Faloon, relying on the release, moved for summary judgment. Hauf and Barrow likewise moved for summary judgment.

The district court granted the motion of the Foundation and Faloon and denied the motion of Hauf and Barrow, explaining: "The language of the 'Standard Release of Testimonials & Photos' in this case is unambiguous." *Hauf v. Life Extension Found*., 640 F. Supp. 2d 901, 905 (W.D. Mich. 2009). The parties then submitted, and the court entered, a stipulated order dismissing Barrow and Faloon from the litigation. This timely appeal followed.

## II.

## A.

We review a district court's grant of summary judgment de novo. *Farhat v. Jopke*, 370 F.3d 580, 587 (6th Cir. 2004). Summary judgment is appropriate when there is no genuine dispute as to any material fact as to an essential element of the nonmoving party's case. Fed. R. Civ. P. 56(a). An issue of fact is "genuine" if a reasonable person could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). The party moving for summary judgment has the initial burden to show that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). After the moving party has satisfied its burden, the burden

shifts to the nonmoving party to set forth "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

**B.**

Hauf enumerates nine assignments of error on appeal. Appellant's Br. 2–3. On inspection, however, only four distinct issues are identified: (1) whether the court erred in concluding the release is a "release" rather than an "authorization"; (2) whether the court erred in concluding that the scope of the release is unambiguous; (3) whether the court erred in concluding that the release authorizes the Foundation to modify the language of the testimonial without Hauf's knowledge; and (4) whether the court erred in concluding that the release does not violate public policy. Each is addressed in turn.

**1.**

The district court correctly concluded that the document at issue, titled a "Standard Release of Testimonials and Photos" is, as its title suggests, a release. The document begins by stating in bold-faced, capitalized letters that it is a "**RELEASE**." And it concludes, in the line immediately preceding Hauf's signature, by reiterating that it is a "release."

Hauf nevertheless disputes that "release" means release. To interpret the meaning of a disputed term, this Court looks to, inter alia, "the plain language" and "relevant dictionary definitions of the term." *City of Wyandotte v. Consol. Rail Corp.*, 262 F.3d 581, 586 (6th Cir. 2001) (citing *Kerns, Inc. v. Wella Corp.*, 114 F.3d 566, 569 (6th Cir. 1997); *N. Am. Specialty Ins. Co. v. Myers*, 111 F.3d 1273, 1278 (6th Cir. 1997)).

The plain language, naturally, must speak for itself. In pertinent part, it provides that Hauf grants the Foundation the "the irrevocable right" to use her "name (or any fictional name), picture,

portrait, digital image, or photograph in all forms and media and in all manners." She further agrees to "waive any right to inspect or approve the finished product, including written copy." And the document plainly states and restates that it is a "release."

Turning to relevant dictionary definitions, *Webster's* variously defines a release as "a giving up (as of a right or claim)" and "an act or instrument by which a legal right is discharged." *Webster's Third New International Dictionary* 1917 (unabridged ed. 1993). Similarly, *Black's* defines "release" as "[a] written authorization or permission for publication" and "[t]he act of conveying an estate or right to another, or of legally disposing of it." *Black's Law Dictionary* 1315–16 (8th ed. 2004). As noted above, the document at issue provides a written authorization for the publication of Hauf's name and image "in all forms and media." And the document provides that Hauf releases "any right to inspect or approve the finished product." The district court correctly concluded that the document is what it titles itself as—a release.

**2.**

The district court likewise correctly concluded that the scope of the release is unambiguous. "The general rules governing the construction of contracts are applicable in the construction of written releases." 76 C.J.S. *Release* § 43. "Whether or not a contract is ambiguous is a question of law properly determined by the district court." *City of Wyandotte*, 262 F.3d at 585 (citing *Sault Ste. Marie Tribe of Chippewa Indians v. Engler*, 146 F.3d 367, 373 (6th Cir. 1998)) (applying Michigan law).[2] "The court examines the contract as a whole, giving effect to all parts and language of a

---

[2] The district court interpreted the document at issue under Michigan law. *See Hauf v. Life Extension Found.*, 640 F. Supp. 2d 901, 905 n.3 (W.D. Mich. 2009) (citing *Cleveland-Cliffs Iron Co. v. Chicago & N. W. Transp. Co.*, 581 F. Supp. 1144, 1149–50 (W.D. Mich. 1984)). On appeal, neither party contests this choice of law—indeed, neither party briefs the issue. As an aside, however, we note that the district court was correct. Because the case was brought pursuant to both diversity and federal-question jurisdiction, in the case of a conflict in choice of law, we would apply the choice of law rules of the forum state, Michigan. *See generally Trinh v. Citibank, N.A.*, 623 F. Supp. 1526, 1530 (E.D. Mich.

written agreement according to their ordinary and natural meaning." *Wonderland Shopping Ctr. Venture Ltd. P'ship v. CDC Mortg. Capital, Inc.*, 274 F.3d 1085, 1092 (6th Cir. 2001) (internal quotation marks omitted) (citing *City of Wyandotte*, 262 F.3d at 585) (applying Michigan law); *see also Holland v. Trinity Health Care Corp.*, 791 N.W.2d 724, 727 (Mich. Ct. App. 2010) ("We enforce contracts according to their terms, as a corollary of the parties' liberty of contracting." (citing *Rory v. Cont'l Ins. Co.*, 703 N.W.2d 23, 30 (Mich. 2005))).

"[A] contract is ambiguous when two provisions irreconcilably conflict with each other, or when a term is equally susceptible to more than a single meaning." *Trinity Health Care Corp.*, 791 N.W.2d at 727 (alterations and internal quotation marks omitted) (quoting *Coates v. Bastian Bros., Inc.*, 741 N.W.2d 539, 543 (Mich. Ct. App. 2007)). "The rule of contra proferentum (construction of an agreement against its drafter) is used only when there is a true ambiguity and the parties' intent cannot be discerned through all conventional means, including extrinsic evidence." *Coates*, 741 N.W.2d at 543 n.3 (citing *Klapp v. United Ins. Grp. Agency, Inc.*, 663 N.W.2d 447, 470–71 (Mich. 2003)). "If the parties' intent is unambiguously clear from the language of the written agreement, the court must enforce the parties' intent as expressed in the writing." *Wonderland Shopping Ctr.*, 274 F.3d at 1092 (quoting *Birchcrest Bldg. Co. v. Plaskove*, 120 N.W.2d 819, 823 (Mich. 1963)). If the language is unambiguous, parol evidence will not be considered. *See Shay v. Aldrich*, 790

---

1985) (holding that a court having both types of jurisdiction should apply the forum state's choice-of-law rules, thereby treating the case as one arising under diversity jurisdiction), *aff'd* 850 F.2d 1164 (6th Cir. 1988). Here, however, no conflict exists. Both federal common law and Michigan follow the *Restatement (Second) of Conflict of Laws*. *Compare Med. Mut. of Ohio v. De Soto*, 245 F.3d 561, 570 (6th Cir. 2001) (adopting *Restatement* as matter of federal common law), *with Chrysler Corp. v. Skyline Indus. Servs., Inc.*, 528 N.W.2d 698, 702 (Mich. 1995) (adopting *Restatement* as matter of Michigan law). Thus, because the release does not contain a choice-of-law provision, the "most significant relationship" test applies. The place of contracting was Michigan, where Hauf manifested her acceptance. The negotiation, in contrast, took place "on the cloud"—via email, fax, and phone conversations. The record is silent as to the place of performance. The subject matter of the contract, Hauf, is located in Michigan. On balance, Michigan has the most significant relationship to the contract, and so Michigan law applies to the contract issues before the Court.

N.W.2d 629, 640–41 (Mich. 2010) ("[R]eleases are generally treated as contracts under Michigan law and, thus, subject to the parol evidence rule, which prohibits the use of extrinsic evidence to interpret unambiguous language within a document.").

In this case, the scope of the release can be separated into three distinct parts—the who, the what, and the how. The release begins by stating to whom Hauf is giving the "irrevocable right": "Life Extension Foundation and all its business affiliates, its assigns, licensees, and legal representatives." Next, the release states what the Foundation may use: "[Hauf's] name (or any fictional name), picture, portrait, digital image, or photograph in all forms and media." Finally, the release states how the Foundation may use Hauf's name and image: "in all manners, including composite or distorted representations, for advertising, trade or any other legal purposes." Moreover, the release provides, Hauf agrees to "waive any right to inspect or approve the finished product, including written copy." In sum, the release is unambiguous; its plain language provides that the Foundation may use Hauf's name for advertising, trade or any other legal purposes, including in composite or distorted representations, without Hauf's inspection or approval.

Hauf's arguments to the contrary are unpersuasive. Hauf first argues that "the body of the 'release'/authorization only refers to names, photographs and other images; it is entirely ambiguous whether that language also refers to testimonials." Appellant's Br. 27. Hauf is correct that the body of the release does not expressly reference testimonials. It does not need to. The release provides that the Foundation may use Hauf's name and image "in all manners, including composite or distorted representations, for advertising, trade or any other legal purposes." One manner of using her name and image is as a testimonial of a satisfied customer. Moreover, this may be the most

logical use, as neither Hauf's name nor her image has independent commercial value (Hauf is not a celebrity spokesperson, for example).

Hauf also argues that "there is no indication of exactly what legal right [she] is relinquishing." Contrary to Hauf's assertion, the release plainly states that Hauf grants the Foundation the right to use her "name (or any fictional name)" and her image "in all manners, including composite or distorted representations, for advertising, trade or any other legal purposes," and that Hauf releases "any right to inspect or approve the finished product, including written copy." Simply put, Hauf is relinquishing the advertising rights in her name to the Foundation. The scope of the release is unambiguous.

**3.**

The district court correctly concluded that the release authorized the Foundation to modify the language of the testimonial without Hauf's knowledge. The release expressly grants the Foundation the right to use Hauf's name "in all manners, including composite or distorted representations, for advertising, trade or any other legal purposes" and Hauf releases "any right to inspect or approve the finished product, including written copy." Thus, under the release's plain terms, the testimonial Hauf faxed to the Foundation may be modified (or, in the release's distinctive diction, "distorted").

Hauf's argument to the contrary, that waiving "any right to inspect or approve the finished product, including written copy" does not authorize the modification of her testimonial, is unpersuasive. Hauf defines "copy" to mean "duplicate," the "reproduction of an original work." Thus, Hauf reasons, "the release only authorizes defendant to use plaintiff's testimonial and her testimonial alone." Appellant's Br. 31 (emphasis and internal quotation marks omitted). "[I]nstead

-10-

of reproducing a 'copy' of plaintiff's testimonial," Hauf concludes, "defendant fabricated a new and false testimonial and attributed it to plaintiff." *Id*. at 30.

Hauf is correct that "copy" may mean "duplicate," among other things. In this case, however, the context in which "copy" is used shows that it does not mean "duplicate" but "advertising copy," the written text of an advertisement. In construing a contract, "[t]he court examines the contract as a whole, giving effect to all parts and language of a written agreement according to their ordinary and natural meaning." *Wonderland Shopping Ctr.*, 274 F.3d at 1092 (citing *City of Wyandotte*, 262 F.3d at 585) (internal punctuation omitted). In pertinent part, the release provides that Hauf grants the Foundation the right to use her name "in all manners, including composite or distorted representations, for advertising, trade or any other legal purposes" and Hauf releases "any right to inspect or approve the finished product, including written copy." Thus, under the terms of the release, Hauf gives the Foundation carte blanche in its use of her name for advertising. This means that the Foundation may use Hauf's original testimonial as advertising, or it may modify the language and nevertheless use Hauf's name, or it may create a wholly new "testimonial" and ascribe it to Hauf, as long as its purpose is not illegal. And the Foundation may do all of this without Hauf inspecting or approving the finished product.

Alternatively, Hauf argues, the Lanham Act categorically prohibits modifying the language of a testimonial. In support, Hauf cites a single case, *Facienda v. NFL Films, Inc.*, 542 F.3d 1007 (3d Cir. 2008). Her reliance is misplaced. In that case, John Facenda, "known by many football fans as 'the Voice of God,'" signed a release shortly before his death in 2004 giving NFL Films "the unequivocal rights to use the audio and visual film sequences recorded of me . . . provided, however, such use does not constitute an endorsement of any product or service." *Id*. at 1011–12. The next

year, NFL Films used Facenda's voice in its production of "The Making of Madden NFL 06." *Id.* at 1012. When his estate brought suit alleging the use constituted an endorsement of the videogame, the NFL raised the release as a defense. *Id.* at 1022–23. Considering the issue, the Third Circuit wrote: "In the contract, Facenda waived his rights with regard to any uses that were not endorsements. But if the Estate succeeds in proving the elements of its false-endorsement claim, such a finding by the District Court will demonstrate that the NFL's use of Facenda's voice was an endorsement, falling outside the contract's waiver clause." *Id.* at 1023. "On the other hand," the court explained, "if the Estate's false-endorsement claim were to fail, meaning that the use was not an endorsement, the contract's waiver would apply to that claim. Thus, what falls inside the Lanham Act's prohibitions defines what is outside the contract's waiver." *Id.* The court's holding was based on the plain language of the contract.

Hauf, however, offers a different interpretation of the decision, writing: "As in *Facenda*, if defendants had only used plaintiff's actual testimonial then the release agreement may potentially act as a defense"—but, she argues—"if plaintiff in this case can show that the testimonials published by defendant were not the testimonial provided by plaintiff, then such conduct is not protected by the release regardless of its provisions." Appellant's Br. 31. Contrary to Hauf's assertion, *Facenda* does not stand for the proposition that a court should ignore the express language of a release. Rather, it stands for the opposite proposition. The release's express terms authorize the Foundation to modify the language of the testimonial without Hauf's knowledge.

**4.**

Finally, the district court correctly concluded that the release is not void as against public policy. Hauf is quite right that, "as a general proposition, contracts in violation of statutes enacted

-12-

to protect the public against imposition or fraud are void." Appellant's Br. 33. The plain language of the release, however, does not violate any statutes; rather, its scope is expressly limited to "legal purposes." *See generally* 76 C.J.S. *Release* § 43 ("[W]ritten releases will be construed reasonably and given effect according to their plain terms."). Moreover, the manner in which the release was used does not constitute fraud. Hauf herself concedes that the modifications were principally "changes to the verbiage of the testimonial." Appellant's Br. 4.

First, as matter of long-standing federal policy, "[t]he general rule is that competent persons shall have the utmost liberty of contracting and that their agreements voluntarily and fairly made shall be held valid and enforced in the courts." *Twin City Pipe Line Co. v. Harding Glass Co.*, 283 U.S. 353, 356 (1931), *quoted in FDIC v. Am. Cas. Co.*, 998 F.2d 404, 409 (7th Cir. 1993). "The power to deny enforcement of contract terms on public policy grounds is restricted to those situations in which the contract would violate 'some explicit public policy that is well-defined and dominant, and is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interest.'" *Am. Cas. Co.*, 998 F.2d at 409 (quoting *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 43 (1987)).

"In defining 'public policy,'" the Michigan Supreme Court similarly cautions, "the focus of the judiciary must ultimately be upon the policies that, in fact, have been adopted by the public through our various legal processes, and are reflected in our state and federal constitutions, our statutes, and the common law." *Terrien v. Zwit*, 648 N.W.2d 602, 608 (Mich. 2002). Moreover, the Michigan Supreme Court firmly defends the liberty to contract: "[U]nless a contract provision violates law or one of the traditional defenses to the enforceability of a contract applies, a court must

-13-

construe and apply unambiguous contract provisions as written." *Rory v. Cont'l Ins. Co.*, 703 N.W.2d 23, 26 (Mich. 2005).

In this case, the release provides that Hauf grants the Foundation the right to use her name "in all forms and media and in all manners . . . for advertising, trade or any other legal purposes." By its express terms, the release's scope is thus limited to "purposes" that are "legal." *See generally In re SBC Mich.*, 754 N.W.2d 259, 273 (Mich. 2008) (citing *Griffith v. State Farm Mut. Auto. Ins. Co.*, 697 N.W.2d 895 (Mich. 2005) ("As a general matter, words and clauses will not be divorced from those which precede and those which follow. When construing a series of terms we are guided by the principle that words grouped in a list should be given related meaning." (internal punctuation omitted)); 11 Richard Lord, *Williston on Contracts* § 32:6 (4th ed. 1999 & Supp. 2010) ("The ancient maxim *noscitur a sociis* summarizes the rule of both language and law that the meanings of particular words may be indicated or controlled by associated words."). The release's plain language provides that it extends only to "lawful" purposes. Accordingly, Hauf's observation that "contracts in violation of statutes enacted to protect the public against imposition or fraud are void" is inapposite. By its express terms, the release limits its scope to legal purposes. And Hauf identifies no authority holding that a voluntarily executed release granting the use of an individual's name "for advertising, trade or any other legal purposes" is contrary to public policy. The plain language of the release does not violate public policy.

Likewise, the de minimis alterations to the testimonial do not offend public policy. Hauf directs our attention to three additions, which she contends "created false, inaccurate and misleading testimonials." Appellant's Br. 16. They are: (1) "In my search for a way to save my son's life, someone referred me to Life Extension"; (2) "The People at your organization supported my search

-14-

for different treatment regimens we could try"; and (3) "Through your organization I found out about a treatment called Immuno Augmentative Therapy." *Id.* at 12–13 n.4. None of these additions, however, regard the quality or efficacy of the products offered by the Foundation. They do not misrepresent the effectiveness of immuno-augmentative therapy, for example, or create a false impression regarding how the Foundation's products helped Hauf's son.[3] Indeed, they do not reference any of the Foundation's products. In sum, neither the language of the release, nor the additions that it in fact authorized, violate public policy.

**\*\*\***

The district court's decision is affirmed.

---

[3] Indeed, any substantive misstatements regarding Barrow's story appear to have been made by Hauf herself. Barrow's surgeon, for example, testifies that the surgery completely eradicated Barrow's tumor and that he never told Hauf or Barrow that Barrow had only six months to live. Likewise, Dr. Andrade testifies that he in fact recommended radiation and chemotherapy for Barrow, but that the mother and son rejected his advice, and that he never told them that Barrow had only six months to live if he did not receive treatment. Dr. Andrade also notes that Hauf did not show him the MRIs and CAT scans taken following the January 21, 1991 surgery, which Dr. Andrade now agrees show Barrow "was recovering a hundred percent."

-15-